CARMINE CARBONE *v.* ALEX VIGLIOTTI ET AL.
(14350)

PETERS, C. J., SHEA, COVELLO, BORDEN and BERDON, Js.

Argued January 8—decision released June 2, 1992

*Mark T. Kelly,* for the appellant (plaintiff).

*Roy H. Scharf,* for the appellee (named defendant).

SHEA, J. The plaintiff, Carmine Carbone, who owns the land over which the named defendant, Alex Vigliotti, claims a right-of-way for access to a public street from a two-family house constructed on this defendant's property, brought this action to enjoin such a use, to obtain a declaratory judgment that the construction of the house violates the zoning regulations of the town of Branford and to secure other appropriate relief, including damages. The trial court rendered judgment for the defendants.[1]

In his appeal[2] the plaintiff claims: (1) that the unity of title doctrine; *Curtin* v. *Franchetti,* 156 Conn. 387, 242 A.2d 725 (1968); bars the conclusion of the trial court that the defendant is entitled to use the right-of-way for the two-family house he has constructed; and (2) that the undisputed facts establish that the construction and location of the house violate the zoning regulations as a matter of law, despite the contrary holding of the court. We conclude that the plaintiff cannot prevail on either of these claims, and we affirm the judgment.

---

[1] In addition to the named defendant, the plaintiff included as defendants the town of Branford, several town zoning and building officials, a bank holding a mortgage on the property of the named defendant, and other persons who may possibly have an interest. The trial court found that all persons having an interest in the subject matter of the complaint had been made parties or had been given reasonable notice of the action. For convenience we use the word "defendant" to refer only to Alex Vigliotti, the named defendant.

[2] The plaintiff appealed to the Appellate Court, but we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

There is no dispute about the facts, to most of which counsel commendably stipulated. The plaintiff owns a two-family house on East Main Street in Branford, in which he resides and also conducts his business as a certified public accountant. He purchased this property on June 16, 1978. At its northwest corner, a strip of land 26.5 feet wide, which is used as a driveway, extends westerly about 165 feet to Chestnut Street. The plaintiff maintains the driveway to provide his tenants, employees and clients with access from Chestnut Street to a parking lot at the rear of his house. The occupants of another two-family house fronting on East Main Street and situated on a lot adjoining the plaintiff's land on the east also use the driveway for access from Chestnut Street to the rear of their property, and the plaintiff concedes their right to do so.

On October 6, 1986, the defendant purchased a tract of land lying north of the plaintiff's driveway and comprised of four contiguous parcels designated as parcels 1, 2, 3 and 4 on the diagram included in the appendix to this opinion. After his original proposal to develop the entire tract for the purpose of building condominium units was rejected by the Branford planning commission, the defendant proceeded to divide parcel 1 into two lots, both of which front on Chestnut Street. He reconstructed the existing two-family house on one of these lots and erected a new two-family house on the other lot. The remainder of the tract, parcels 2, 3, and 4, which lie along the rear of the two lots fronting on Chestnut Street, were combined into one lot for the purpose of building another two-family house thereon. A strip of land twenty feet wide was taken from the rear of the two lots that front on Chestnut Street and added to the westerly boundary of parcels 2, 3 and 4 in order to construct a driveway extending to the plaintiff's driveway, which leads to Chestnut Street and over

which the defendant claims a right-of-way.[3] The defendant obtained a building permit on February 8, 1988, to erect a two-family house on the interior lot and began construction soon afterward.

Although the plaintiff had observed the construction activity on the interior lot comprised of parcels 2, 3 and 4 some time earlier, he first learned in the late summer or fall of 1988 of the defendant's intention to use for ingress and egress the portion of the driveway extending from the southerly boundary of that lot to Chestnut Street. The defendant used a strip of land along the boundary between the two lots fronting on Chestnut Street for access to the interior lot during the course of construction of the house on that property. In this strip he has installed water and sewer lines that service the house on the interior lot.

The plaintiff commenced this action on January 10, 1989, after the foundation had been installed, the house had been framed, rough plumbing, heating, air-conditioning and electrical wiring had been completed and the defendant was preparing to install sheetrock. The defendant continued his work on the house and completed its construction by July 20, 1989, when he obtained a certificate of occupancy from the town of Branford. At the time of trial in May, 1991, the house was occupied by the defendant's tenants, who continued to use the strip of land between the two lots fronting on Chestnut Street for access to the interior lot during the pendency of this litigation.

After examining the deeds of title to the land involved, the trial court concluded that parcels 2, 3 and 4, which the defendant had combined to form the

[3] The defendant also testified that the addition of twenty feet of area to the interior lot made it possible to select a location for the house that would avoid disturbance of some wetlands on the property and would provide a more adequate backyard.

interior lot, had "an appurtenant right-of-way" over the 26.5 foot wide driveway of the plaintiff from the southerly boundary of the interior lot to Chestnut Street, a distance of approximately 165 feet, for "[v]ehicular and pedestrian use . . . for ingress and egress to and from" the interior lot. The court rejected claims advanced at trial by the plaintiff that the defendant had abandoned by nonuser the right-of-way granted in the deeds and that to permit his proposed use would overburden that easement.[4] With respect to the claimed violations of zoning and subdivision regulations, the court concluded that the defendant had adequately satisfied the requirements of the regulations involved.

## I

On appeal the only challenges raised by the plaintiff to the trial court's conclusion that the defendant's interior lot has an appurtenant right-of-way over the portion of the plaintiff's driveway extending from that lot to Chestnut Street are: (1) the insufficient basis for finding in the relevant conveyances an intention to create an easement for the benefit of that parcel; and (2) the failure of the court to recognize that, even if such an intention had existed, the "unity of title doctrine" precludes the creation of such an easement for parcel 2, which lies *between* parcels 3 and 4, and, therefore, bars its use by occupants of the house on the interior lot, which comprises the three parcels. We agree with the plaintiff that the documents relied upon by the defendant do not adequately support the conclusion that an easement appurtenant to parcel 2 over the plaintiff's driveway has been created. We hold, nevertheless, that the unquestioned grant of a right-of-way over the plaintiff's driveway for access to Chestnut Street contained in the deed to parcel 4, which the

---

[4] The plaintiff has not sought review of the trial court's findings relating to abandonment or overburdening of the easement.

defendant has now acquired, allows the use of the right-of-way for the benefit of the occupants of the house, which is situated on the boundary line between parcels 2 and 4. Because of these conclusions it is not necessary to resolve the issue of the continuing viability of the unity of title doctrine in this state.

### A

The first reference in the exhibits introduced at trial to the disputed right-of-way to Chestnut Street is contained in a November 30, 1936 deed from Gustave Hamre conveying parcel 4 to Harry Carsten "[t]ogether with a right of way across [parcel 2] . . . also across a strip of land ten feet wide, located [on parcel 3] . . . and thence through a [26.5] foot right of way . . . to Chestnut St[reet]." On the same date, Gustave Hamre deeded parcel 2 to Frank Beach subject to the right-of-way granted to Carsten for parcel 4, but without creating as an appurtenance to parcel 2 any right to use the 26.5 foot right-of-way to Chestnut Street. At that time Beach owned land bounding parcel 2 on the east and fronting on East Main Street, and parcel 2 was an addition to his rear yard. Beach later transferred parcel 2 to Carsten, who on March 19, 1947, conveyed both parcels 2 and 4 to George Edwards.[5]

On September 10, 1947, Edwards acquired title to parcel 3 from John Hamre, who then owned the 26.5 foot strip of land constituting the disputed right-of-way. The deed for this transfer, following the description of parcel 3, contains a recital that "[s]aid grantee has

---

[5] The deed of parcel 2 from Frank Beach to Harry Carsten is not contained in the record. A map dated August 11, 1947, indicates, however, that Carsten had a right-of-way ten feet in width extending eastwardly from parcel 2 to East Main Street along the northerly boundary of Beach's land fronting on East Main Street. The deed from Carsten to George Edwards refers to no right-of-way appurtenant to parcel 2, but only to the easement created for the benefit of parcel 4 for access to Chestnut Street, to which parcel 2 is subject.

right of way over land of Grantor to Chestnut Street''
and also refers to a map dated August 11, 1947, show-
ing parcel 3 with the legend, ''Land of John A. Hamre
to be deeded to George Edwards,'' as well as a further
legend indicating that George Edwards and two others
''have a right of way'' over the strip leading to Chest-
nut Street. This recital and the map are apparently the
sole basis for the trial court's conclusion that John
Hamre intended to give to George Edwards, the plain-
tiff's predecessor in title to parcels 2, 3 and 4, a right-
of-way as an appurtenance to parcel 2 over the 26.5
foot strip. Prior to this conveyance, Edwards possessed
such a right by virtue of his ownership of parcel 4, as
the plaintiff concedes.

The construction of a deed in order to ascertain the
intent expressed in the deed presents a question of law
and requires consideration of all its relevant provisions
in the light of the surrounding circumstances. *Taylor*
v. *Dennehy,* 136 Conn. 398, 402, 71 A.2d 596 (1950).
On appeal the scope of review of such a question is ple-
nary and does not require '' 'the customary deference
to the trial court's factual inferences.' '' *Contegni* v.
*Payne,* 18 Conn. App. 47, 51, 557 A.2d 122 (1989). In
this case the language of the deed as well as of the map
legends does not unequivocally create an easement over
the strip for the benefit of parcel 2, but may have been
intended simply to acknowledge that the grantee, as
the owner of parcel 4, had such an easement. See *Ozyck*
v. *D'Atri,* 206 Conn. 473, 479, 538 A.2d 697 (1988).
Even if this language could reasonably be construed
to have created a right-of-way over the strip, the
absence of any reference to parcel 2, except as a bound-
ary in the description of parcel 3, would indicate that
its benefit was restricted to parcel 3. Furthermore, the
map referred to in the deed of parcel 3 from John
Hamre to Edwards, dated approximately one month

before that conveyance, shows parcel 2 to have a ten foot right-of-way over land of Frank Beach, its previous owner, to East Main Street.[6]

## B

"The way can become legally attached to the dominant estate only if the same person has unity of title to both the way and the dominant estate." *Curtin* v. *Franchetti,* 156 Conn. 387, 389, 242 A.2d 725 (1968). Under this rule the conveyance of parcel 3 by John Hamre to George Edwards could not have created a right-of-way over the 26.5 foot strip as an appurtenance to parcel 2, even if such an intention were plainly expressed in the deed, because John Hamre did not then own parcel 2, the "dominant estate," but only the "way," the servient estate. The defendant urges that we overrule *Curtin* and abandon the unity of title doctrine, as several other states have done. See, e.g., *Willard* v. *First Church of Christ, Scientist,* 7 Cal. 3d 473, 498 P.2d 987, 102 Cal. Rptr. 987 (1972); *Townsend* v. *Cable,* 378 S.W.2d 806, 808 (Ky. 1964); *Garza* v. *Grayson,* 255 Or. 413, 467 P.2d 960 (1970).

In *Ozyck* v. *D'Atri,* supra, 479, however, this court declined to reconsider our adherence to this doctrine because it was not clear in that case that the grantor had intended to create an easement for the benefit of a "stranger to the title." While we recognized that several commentators view the unity of title doctrine as an obsolete vestige of feudalism that frustrates the intention of the grantor; H. Harris, "Reservations in Favor of Strangers to the Title," 6 Okla. L. Rev. 127 (1953); 2 American Law of Property (Casner Ed. 1952) § 8.29; 5 Restatement, Property § 472, comment a; we decided to defer reconsideration of the subject until we

---

[6] See footnote 5, supra. At the time of trial this right-of-way was overgrown and was obstructed by a garage erected on the servient property several years before the defendant acquired parcel 2.

are confronted with a case in which the grantor's intention to create an interest that would violate the rule is "reasonably clear." *Ozyck* v. *D'Atri,* supra. In view of our conclusion that there is insufficient evidence to support the inference that John Hamre, in conveying parcel 3, intended to create an easement for the benefit of parcel 2, which he had never owned, the present case affords no more appropriate an occasion than did *Ozyck* for reconsideration of the unity of title doctrine.

C

The plaintiff does not dispute that the defendant, as the owner of parcel 4, has acquired a right-of-way over the 26.5 foot strip for use in conjunction with that parcel or that approximately one half of the two-family house for which the defendant seeks to exercise this right is situated on parcel 4. The proposed use of the strip to provide access to Chestnut Street for the benefit of the tenants occupying the house is not materially different from that contemplated when Gustave Hamre conveyed parcel 4 in 1936 with a right-of-way to Chestnut Street. The circumstance that one half of the house is situated on parcel 2 does not indicate that the right-of-way will be overburdened or subjected to uses beyond those envisioned at the time of the conveyance of parcel 4. Only one house has been built on the three parcels, which have now been combined to form a single building lot. In granting the right-of-way for access to Chestnut Street as an appurtenance to parcel 4, Gustave Hamre must have realized that it would someday probably be used for that purpose by the occupants of a dwelling similar to those in the surrounding area, several of which are two-family houses. We are "warranted in assuming that the parties to the conveyance contemplated a normal development of the use of the dominant tenement." 5 Restatement, Property § 484.

The doctrine that "[a]n easement cannot be made to attach to other land which the owner of a dominant estate may subsequently acquire"; 2 G. Thompson, Real Property (1961 Repl.) § 322, p. 77; see *Ozyck* v. *D'Atri,* supra, 479; was intended to protect the servient estate from the use of an easement in a manner or to an extent not within the reasonable expectations of the parties at the time of its creation. In this case, however, the addition of parcels 2 and 3 to lot 4 in order to form a single building lot has not changed either the character or the extent of the proposed use of the easement to Chestnut Street. The plaintiff relies on the decision of the Appellate Court in *Lichteig* v. *Churinetz,* 9 Conn. App. 406, 411–12, 519 A.2d 99 (1986), in which the owner of the dominant estate was enjoined from using an easement appurtenant to that property, on which a residence was situated, for the purpose of providing access to a house on other land that he owned. That case is readily distinguishable, however, because in that case there had been a material increase in vehicular traffic on the easement resulting from its use by occupants of the other house. Id., 409. We conclude that, when no significant change has occurred in the use of the easement from that contemplated when it was created, as in this case, the mere addition of other land to the dominant estate does not constitute an overburden or misuse of the easement. Accordingly, we affirm the trial court's conclusion that the defendant is entitled to use the 26.5 foot strip as a right-of-way to and from Chestnut Street for the benefit of the residents of the two-family house situated on parcels 2, 3 and 4.

## II

The plaintiff also claims that, by constructing a two-family house on the interior lot comprised of parcels 2, 3 and 4, the defendant has violated § 1-2 of the Branford subdivision regulations, which requires approval by the planning and zoning commission of any subdi-

vision or resubdivision, and § 25.2.1 (1) of the Branford zoning regulations, which requires such approval for interior lots and also specifies that "[t]he lot shall be located in an R-3, R-4 or R-5 Zone and shall be used only for a single family dwelling." The trial court resolved both these issues in favor of the defendant, and we affirm its decision.

### A

Section 1-2 of the subdivision regulations prohibits any "subdivision" of land without the approval of the planning and zoning commission. The term "subdivision" is defined in § 1-7-3a[7] to include "the division of a tract or parcel of land into three or more parts or lots for the purpose, whether immediate or future, of sale or building development . . . ." Section 8-18 of the General Statutes,[8] however, restricts the application of this definition to divisions of land "made subsequent to the adoption of subdivision regulations." It is undisputed that parcels 1, 2, 3 and 4 had been created as separate parcels before the Branford subdivision regulations became effective in 1954. The plaintiff claims, nevertheless, that when the defendant acquired the four parcels in 1986, he intended to use the entire tract for a condominium development and must be deemed to have merged the four parcels into a single

---

[7] Section 1-7-3a of the Branford subdivision regulations provides: "Subdivision means the division of a tract or parcel of land into three or more parts or lots for the purpose, whether immediate or future, of sale or building development expressly excluding development for municipal, conservation or agricultural purposes, and includes resubdivision."

[8] General Statutes § 8-18 provides in part: "DEFINITIONS. As used in this chapter: 'Commission' means a planning commission; 'municipality' includes a city, town or borough or a district establishing a planning commission under section 7-326; 'subdivision' means the division of a tract or parcel of land into three or more parts or lots made subsequent to the adoption of subdivision regulations by the commission, for the purpose, whether immediate or future, of sale or building development expressly excluding development for municipal, conservation or agricultural purposes, and includes resubdivision . . . ."

piece of land, thus destroying their status as separate parcels. In view of the finding that the defendant had purchased the four parcels "to develop condominium units" and the undisputed evidence that he had submitted a proposal for such a development of the entire tract, the plaintiff contends that the trial court was bound to conclude that a merger had occurred so that the subdivision regulations were applicable.

"Contiguous land all owned by the same proprietor does not necessarily constitute a single lot." *Schultz* v. *Zoning Board of Appeals,* 144 Conn. 332, 338, 130 A.2d 789 (1957). The plaintiff concedes that whether a merger of contiguous parcels of land has occurred depends on the intention of the owner and that such an issue is factual. See *Marino* v. *Zoning Board of Appeals,* 22 Conn. App. 606, 608–10, 578 A.2d 165, cert. denied, 216 Conn. 817, 580 A.2d 58 (1990); *Molic* v. *Zoning Board of Appeals,* 18 Conn. App. 159, 164, 556 A.2d 1049 (1989). The trial court found that "[a]t no time did [the defendant] intend to merge said parcels into one tract if the application was rejected . . . ." For this court the only question is whether the finding of the trial court that no such merger occurred is clearly erroneous, despite the defendant's unsuccessful application to erect condominium units on the entire tract. See Practice Book § 4061; *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 435 A.2d 24 (1980).

Although there was no testimony expressly indicating that the defendant's original intention to use the entire tract for a condominium development was conditioned on approval of that proposal by the planning commission, such an inference may reasonably have been drawn from the evidence. It would have been quite unusual for an experienced builder, like the defendant, not to have had alternative uses for the property in mind in the event that his original plan should be dis-

approved. The four parcels continued to be separately assessed and taxed after he purchased them. He applied for building permits in pursuit of his plan to erect three two-family houses on the property within a reasonable time after his application for the condominium development had been denied. We conclude that the finding that no merger had occurred is adequately supported by the evidence. Accordingly, we reject the plaintiff's contention that the subdivision regulations were applicable and prohibited his construction of a two-family house on parcels 2, 3 and 4 without the approval of the planning commission.

B

The plaintiff's final claim, that the construction of the two-family house on the interior lot comprised of parcels 2, 3 and 4 violates § 25.2.1[9] of the zoning regulations, is based on the premise that the regulation was intended to apply to a nonconforming interior lot situated in an R-1 zone, in which two-family houses are permitted uses. We agree with the zoning enforcement officer, who approved the lot as eligible for a building permit, that the regulation was inapplicable.

Because the defendant's interior lot lacks frontage on a public street, it does not conform to the zoning

---

[9] Section 25.2.1 of the Branford zoning regulations provides in part: "Interior Lots: An interior lot may be permitted, subject to approval by the Planning and Zoning Commission. When such lot is not part of a subdivision, a record map shall be submitted in two blue or black line prints for approval by the Commission, prior to filing in the Land Records, which map shall be clearly and legibly drawn at a scale if 1″ = 40′ and shall show the following:

* * *

"All of the following requirements shall be met:
"1. The lot shall be located in an R-3, R-4 or R-5 Zone and shall be used only for a single family dwelling.

* * *

"8. In all other respects, each lot shall conform to the requirements of the zone in which it is located."

regulations, which require a minimum frontage of fifty feet in an R-1 zone, in which the lot is situated. Section 5.11.1 of the regulations permits a parcel of land that fails to meet the frontage or other applicable zoning requirements to be used as a lot for the construction of a building provided that "[t]he use, building or other structure shall conform to all other requirements of these Regulations . . . ." Section 25.2.1 permits interior lots "subject to the approval of the Planning and Zoning Commission"[10] and also requires that "[t]he lot shall be located in an R-3, R-4 or R-5 Zone and shall be used only for a single family dwelling." The plaintiff maintains that the permission ostensibly granted by § 5.11[11] to build a house on an existing parcel of land lacking the prescribed street frontage is subject to both of these requirements of § 25.2.1.

[10] There is no substance to the plaintiff's claim that the defendant failed to comply with the provision of § 25.2.1 of the zoning regulations that "[a]n interior lot may be permitted, subject to approval by the Planning and Zoning commission." It is undisputed that the defendant obtained all necessary permits for construction of a two-family house on his interior lot, including a certificate of zoning compliance from the zoning enforcement officer. We have recently construed the Branford zoning regulations to designate the zoning enforcement officer as "the official charged with the responsibility of enforcing the applicable regulations." *Castellon* v. *Board of Zoning Appeals*, 221 Conn. 374, 381, 603 A.2d 1168 (1992). In Branford, the zoning enforcement officer is appointed by the planning and zoning commission pursuant to its authority to "provide for the manner in which the zoning regulations shall be enforced." Id., 378; General Statutes § 8-3 (e). In issuing the necessary zoning approval to the defendant the zoning enforcement officer was acting as the duly authorized agent of the planning and zoning commission. Accordingly, there is no substance to the plaintiff's claim that the defendant had never obtained the approval of that commission for construction of a two-family house on his interior lot.

[11] Section 5.11 of the Branford zoning regulations provides: "Lots: A parcel of land, which fails to meet the area, shape or frontage or any other applicable requirements of these Regulations pertaining to lots, may be used as a lot, and a building or other structure may be constructed, reconstructed, enlarged, extended, moved or structurally altered thereon, provided that all of the following requirements are met:

"5.11.1 The use, building or other structure shall conform to all other requirements of these Regulations;

When zoning regulations were first adopted in Branford in 1956, parcels 2, 3 and 4 were owned by George Edwards and together constituted a lot available for building purposes, despite its lack of frontage on a public street. After the regulations became effective, it retained that status as a nonconforming use, because of the provision of General Statutes § 8-2[12] that "[s]uch regulations shall not prohibit the continuance of any nonconforming use . . . existing at the time of the adoption of such regulations." "Where a nonconformity exists, it is a vested right which adheres to the land itself." *Petruzzi* v. *Zoning Board of Appeals,* 176 Conn. 479, 483, 408 A.2d 243 (1979). Accordingly, we must construe the Branford zoning regulations in such a manner as to avoid a conflict with the statute and the vested right that the defendant acquired when he purchased the land.

If the requirement of § 25.2.1 that an interior lot be located in an R-3, R-4 or R-5 zone were applicable, the defendant's interior lot could never satisfy that provision, because it is situated in an R-1 zone and he would not be permitted to build even a single family house thereon, thus effectively confiscating his nonconforming use of the property. The plaintiff, in recognition of the nonconforming status of the lot, implicitly concedes the inapplicability of this portion of § 25.2.1, but contends that the provision that an interior lot "shall be used only for a single family dwelling" is, neverthe-

"5.11.2 If used for a dwelling, the lot shall contain a minimum area of 4,000 square feet; and

"5.11.3 If the parcel fails to meet the area requirements of these Regulations, the owner of the parcel shall not also be the owner of contiguous land which in combination with such parcel that fails to conform would make a parcel that conforms or more nearly conforms to the area requirements of these Regulations pertaining to lots."

[12] General Statutes § 8-2 provides in part: "Such regulations shall not prohibit the continuance of any nonconforming use, building or structure existing at the time of the adoption of such regulations."

less, applicable. The R-3, R-4 and R-5 zones, to which that provision expressly applies, however, limit residential uses to single family homes, thus rendering the provision redundant with respect to interior lots in those zones, but, nevertheless, strongly corroborative of its purpose to restrict those zones to single family dwellings. The provision would have an impact only if it were applicable to interior lots in R-1 and R-2 zones, in which both two-family and single family houses are permitted. If the drafters of the provision actually intended that its only practical application would occur in R-1 and R-2 zones, however, they have chosen a labyrinthine route to their objective, which could have been accomplished simply by referring to those zones specifically. Furthermore, the evident purpose of the provision, to ensure the conformity of new dwellings with existing dwellings in the same zone, would be thwarted if interior lots in a two-family zone could be used only for single family homes, especially when a particular lot is virtually surrounded by two-family houses, as in this case. Since the provision was designed to achieve uniformity of development in single family zones, to which it is expressly applicable, it would be incongruous to apply it collaterally to R-1 and R-2 zones, in which a mixture of single family and multi-family homes is contemplated as a zoning objective. We conclude that the plaintiff's construction of § 25.2.1 (1) is supported by neither the text of that provision nor the policy it is intended to effectuate.

The judgment is affirmed.

In this opinion the other justices concurred.

*(See Appendix on following page.)*

# APPENDIX