## ABINGTON LIMITED PARTNERSHIP *v.* BRUCE G. HEUBLEIN ET AL.
### (SC 15639)

Berdon, Katz, Palmer, McDonald and Peters, Js.

---

Argued December 9, 1997—officially released September 8, 1998

*Jeffrey J. Mirman*, with whom were *Wesley W. Horton* and, on the brief, *Lisa A. Zaccardelli*, for the appellant (plaintiff).

*Everett E. Newton*, with whom were *Sean P. Clark, Linda L. Morkan, Dennis F. Kerrigan, Jr., David A. Baram* and *Brian J. Comerford*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Barry J. Waters*, for the appellees (defendant Talcott Mountain Science Center for Student Involvement, Inc., et al.).

*Brendan T. Flynn*, with whom, on the brief, were *Donald Gaudreau* and *Jonathan M. Starble*, for the appellee (defendant Katherine Vidal Smith).

PETERS, J. The underlying issue in this case is whether, as a result of the creation of an easement appurtenant granting a right of access over the property of the servient estate, the servient estate also must afford access to adjacent property that was acquired thereafter. In this appeal, however, the first and dispositive issue is whether the trial court judge properly denied a motion for his disqualification in light of the judge's ex parte visit to the property that was the subject of the dispute. Because we conclude that disqualification was required under the circumstances of this case, we reverse the judgment of the trial court and remand the case for a new trial.

The plaintiff, Abington Limited Partnership, the fee owner of a private roadway called Montevideo Road,[1] brought a six count action to quiet title and to remedy an alleged overburdening of an easement of access over its roadway.[2] The defendant Talcott Mountain Science Center for Student Involvement, Inc. (Science Center),[3] acknowledged the use of Montevideo Road but claimed, for various reasons, that the use was rightful. After a court trial, the court, *Satter, J.*, agreed with the defendants on their principal claims and denied the plaintiff's

[1] Montevideo Road is in Avon and Bloomfield.

[2] The plaintiff's complaint contained the following counts against all the defendants: action to settle title, trespass, misuse of easement and overburdening of easement. In addition, the complaint alleged that the defendant Katherine Vidal Smith, who had sold the property to the plaintiff, was liable for breach of warranty under the deed and for breach of contract under the sales agreement.

[3] The additional defendants are: Arch Communications Corporation; Chase Family Limited Partnership No. 7; Fleet Bank, N.A.; Hartford Television, Inc.; Bruce G. Heublein; Candace Heublein Homer; Metro-Mobile CTS of Hartford, Inc.; New England Weather Service, Inc.; Anne Heublein Rudder; Katherine Vidal Smith; the state of Connecticut; the town of Avon; Eric M. Zachs; and Henry M. Zachs. For the purposes of this appeal, the claims asserted against these parties do not differ materially from those relating to the Science Center.

prayer for injunctive relief. The plaintiff's appeal to the Appellate Court was transferred to this court pursuant to Practice Book § 65-1, formerly § 4023, and General Statutes § 51-199 (c).[4]

I

The dispositive legal issue in this case is whether the trial judge improperly denied a motion for his disqualification based upon his ex parte visit to the site of the property directly involved in the litigation before him. Although the judge acknowledged that the visit had been imprudent, he declined to recuse himself.[5] We must decide whether, in the circumstances of this case, the trial judge's imprudence created an appearance of impropriety that required his recusal. We conclude that it did.

At trial, the plaintiff raised two claims in support of its motion for disqualification. The first was that the judge's visit had violated canon 3 (a) (4) of the Code of Judicial Conduct[6] because the judge, in effect, had conducted an improper ex parte investigation of facts disputed at trial. The second was that the judge's visit had violated canon 3 (c) (1) of the Code of Judicial Conduct[7] because, whatever its actual import might have been, it created an appearance of judicial impropriety. We disagree with the first of these claims, but agree with the second.

---

[4] General Statutes § 51-199 (c) provides in relevant part: "The Supreme Court may transfer to itself a cause in the Appellate Court. . . ."

[5] The judge stated: "I think that under the circumstances probably I shouldn't have gone up there but I honestly don't think that in any way it influenced my decision at all or would influence [it] in the slightest."

[6] Canon 3 (a) (4) of the Code of Judicial Conduct provides in relevant part: "A judge shall not initiate, permit or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding . . . ."

[7] Canon 3 (c) (1) of the Code of Judicial Conduct provides in relevant part: "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . ."

## A

Although the plaintiff claims that the judge's visit constituted an improper independent investigation of the facts of the case in violation of canon 3 (a) (4), the plaintiff made no attempt, at trial or on appeal to this court, to demonstrate that the judge's independent observations differed from those gleaned from prior visits with counsel present. Nothing in the record demonstrates that the judge drew on independent knowledge in deciding this case. If the information he gleaned could have had any influence, it would have redounded in favor of the plaintiff.[8] The plaintiff has not taken issue with the fairness of any of the judge's evidentiary rulings at trial. It would be surprising if it were otherwise, because the judge has had a long and widely admired career as a conscientious and fair minded judge of the Superior Court and as a judge trial referee. We conclude that the judge did not violate canon 3 (a) (4).

## B

The plaintiff also claims that the judge's ex parte visit, regardless of its propriety under canon 3 (a) (4), violated the judge's duty, under canon 3 (c) (1), to avoid an appearance of impropriety. In analyzing this ground for disqualification, we emphasize the fundamental distinction between a claim of bias and a claim of an appearance of impropriety. Canon 3 (c) (1) provides in relevant part: "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (A) the judge has . . . personal knowledge of disputed evidentiary facts concerning the proceeding . . . ." To prevail on its

---

[8] The judge's conversation with a local landowner upon his ex parte visit to the site of the property; see part I B of this opinion; uncovered nothing specific other than the landowner's impression that the plaintiff had been given the runaround by the defendants.

claim of a violation of this canon, the plaintiff need not show actual bias. The plaintiff has met its burden if it can prove that the conduct in question gave rise to a reasonable appearance of impropriety.[9]

We use an objective rather than a subjective standard in deciding whether there has been a violation of canon 3 (c) (1). "Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard . . . . The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his . . . impartiality, on the basis of all of the circumstances. . . ." (Citations omitted; internal quotation marks omitted.) *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 745–46, 444 A.2d 196 (1982); *Dubaldo* v. *Dubaldo*, 14 Conn. App. 645, 649, 542 A.2d 750 (1988).

The relevant facts and procedural history are undisputed. On May 12, 1996, the trial court judge and his wife drove from Route 44 to Montevideo Road, using that private road to reach the entrance to the Science Center to look at the view. The Science Center is one of the defendants in this case, and the propriety and extent of its use of Montevideo Road to gain access to Route 44 are crucial issues in the litigation. At the time

---

[9] See also canon 2 (a) of the Code of Judicial Conduct, which provides that "[a] judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 2 (a) recently was interpreted and applied in *In re Flanagan*, 240 Conn. 157, 188–92, 690 A.2d 865, cert. denied, 522 U.S. 865, 118 S. Ct. 172, 139 L. Ed. 2d 114 (1997).

of the judge's visit to the site, he already had begun to preside over the court trial of this case, which had commenced on March 28, 1996. In the presence of all the parties, the judge already had inspected the area twice. The judge did not notify counsel of his ex parte visit to the area.

When the judge arrived in the area, he observed a "For Sale" sign on a house across the way from the Science Center. At that time, the house was owned by James W. Tilney. Although neither the judge nor his wife had any intention of buying Tilney's house, they knocked on Tilney's door and indicated to him that they might be interested in such a purchase. Tilney showed them through his house and showed them the view. Without revealing his identity, the judge initiated a discussion with Tilney about the "legal issue" involving the Science Center. Tilney responded that, in his view, the Science Center had given the plaintiff the runaround. Only when the judge and his wife were leaving did the judge inform Tilney that he was the trial judge adjudicating this very legal issue.[10]

The issue of impropriety came to light during the trial, when, on May 19, 1996, Tilney disclosed to the plaintiff the substance of his ex parte conversation with the judge. The plaintiff moved the trial court judge to disqualify himself and to declare a mistrial. The judge indicated his disinclination to do so, but allowed the plaintiff to present the Tilney testimony and, thereafter, granted the plaintiff's motion to have another judge of the Superior Court conduct an evidentiary hearing to determine the facts.

Pursuant to the procedural standards laid down in *Szypula* v. *Szypula*, 2 Conn. App. 650, 654–55, 482 A.2d

---

[10] The judge agreed that Tilney's testimony was "98 percent accurate." His recollection differed from that of Tilney only with respect to the manner in which the judge disclosed his identity. Without questioning that the disclo-

85 (1984), Judge Maloney undertook the necessary review.[11] No new evidence was presented to him.[12] He listened to the tapes of the trial court proceedings and considered the arguments of counsel. On that record, Judge Maloney determined that, because there was no dispute about the facts relevant to the trial court judge's obligation to recuse himself, there was no basis for conducting an evidentiary hearing. Judge Maloney declined to rule on the ultimate issue of disqualification, which, in his view, was an issue for the trial court judge himself to decide.

In response to the plaintiff's motion for disqualification and mistrial, the trial judge candidly acknowledged, on the record, that "under the circumstances probably I shouldn't have gone up there . . . ." Nonetheless, after having heard Tilney's testimony and having received Judge Maloney's decision, the judge denied the plaintiff's motion and, upon the conclusion of the trial, rendered judgment in favor of the defendants.

In evaluating whether, from an objective standpoint, these facts demonstrate a violation of canon 3 (c) (1), we start from two well established propositions concerning the appearance of judicial impropriety. Although stated separately, each proposition reenforces the other.

The first proposition is that the prevention of the appearance of impropriety is of vital importance to the

---

sure came toward the end of his conversation with Tilney, the judge stated that he thought that he had been more forthcoming about identifying himself.

[11] Judge Maloney disclosed, at the outset, that he had a long-standing, warm personal relationship with the trial court judge. He concluded that this relationship would not be an impediment to his decision because he was not undertaking any inquiry into the veracity of the trial judge or into his suitability to preside over the court trial. Therefore, despite the plaintiff's request for recusal, Judge Maloney conducted the hearing. The plaintiff has noted this ruling in its appellate brief, but has not challenged its validity.

[12] The plaintiff had indicated initially that it might want Tilney's wife to testify, but it did not pursue that course before Judge Maloney.

judiciary and to the judicial process. *Bonelli* v. *Bonelli*, 214 Conn. 14, 19, 570 A.2d 189 (1990). "Members of the judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved . . . . There must also be a recognition that any actions undertaken in the public sphere reflect, whether designedly or not, upon the prestige of the judiciary. . . . Judges must assiduously avoid those contacts which might create even the appearance of impropriety." (Citation omitted.) *In the Matter of Lonschein*, 50 N.Y.2d 569, 572, 408 N.E.2d 901, 430 N.Y.S.2d 571 (1980). "The duty to avoid creating an appearance of impropriety is one of taking 'reasonable precautions' to avoid having 'a negative effect on the confidence of the thinking public in the administration of justice.' *In the Matter of Bonin*, 375 Mass. 680 [707, 378 N.E.2d 669] (1978)." *In re Inquiry Concerning a Judge*, 788 P.2d 716, 723 (Alaska 1990); see also *Liljeberg* v. *Health Services Acquisition Corp.*, 486 U.S. 847, 859–61, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988).[13]

The second proposition is that an inquiry into disqualification of a judge requires a sensitive evaluation of all the facts and circumstances in order to determine whether a failure to disqualify the judge was an abuse of sound judicial discretion. *Bonelli* v. *Bonelli*, supra, 214 Conn. 22. In undertaking such an evaluation, we must be mindful of its intrinsic difficulties. "Judges who are asked to recuse themselves are reluctant to impugn their own standards. Likewise, judges sitting in review of others do not like to cast aspersions. 'Yet drawing all inferences favorable to the honesty and care of the

---

[13] Although the federal case law construes the provisions of 28 U.S.C. § 455 (a) as amended, that federal statute closely resembles our canon 3 (c) (1). *Bonelli* v. *Bonelli*, supra, 214 Conn. 22.

judge whose conduct has been questioned could collapse the appearance of impropriety standard . . . into a demand for proof of actual impropriety.' " *United States* v. *Jordan*, 49 F.3d 152, 157 (5th Cir. 1995).

The record in this case contains persuasive evidence of an appearance of impropriety under canon 3 (c) (1). Whether that evidence requires disqualification is an issue that, in the first instance, is left to the exercise of a trial judge's discretion. *Bonelli* v. *Bonelli*, supra, 214 Conn. 22. Accordingly, our review ordinarily is limited to the question of whether a trial judge has abused his discretion. Id.

In this case, however, the record demonstrates that the judge failed to exercise the appropriate discretion. To support its motion for disqualification, the plaintiff repeatedly brought the provisions of canon 3 (c) (1) to the judge's attention. The judge, nevertheless, based his ruling declining to recuse himself entirely on his determination that his ex parte site visit had not *in fact* caused him to be prejudiced in any way about the merits of the litigation.[14] The issue under canon 3 (c) (1) is

---

[14] After identifying his minor factual disagreement with Tilney's testimony about the manner in which the judge had identified himself, the judge stated:

"I think that I didn't, couldn't—Mr. Tilney was talking—I didn't stop him but I should have stopped him sooner, but I certainly didn't think he said anything of any significance or anything that hadn't been said by [Michael] Konover [authorized representative of the plaintiff], as I recollect clearly, in the testimony of Mr. Konover.

"I never would have gone on that road if it was the first time I'd gone on the road—I'm fully conscious of that fact—but it had been the third time, and I didn't think there was anything significant about going on the road after all of that contact with it.

"I can't see how anything—certainly anything I did—demonstrates any bias on my part in one direction or the other in this case. I don't see how I did anything that indicates in any way my favoritism toward any client or prejudice toward any party in the case.

"Giving all the weight wanted to be given to what Mr. Tilney said, which I should have stopped him [from saying] but I didn't out of just more politeness than anything else at the time, I just don't see any basis for recusing myself."

not, however, whether the judge was impartial in fact. *Papa* v. *New Haven Federation of Teachers*, supra, 186 Conn. 746. At no time did the judge focus his attention on, or exercise his discretion regarding, the correct issue, namely, whether his admittedly imprudent conduct might lead *a reasonable observer*, not knowing whether the judge actually is impartial, to question the judge's impartiality. Id., 745–46.

Undertaking the plenary review that is required in the procedural posture of this case, we must decide whether the evidence of the judge's ex parte site visit would have led an objective observer reasonably to doubt the judge's impartiality. Looking at the undisputed facts, an objective observer would see a judge who: (1) during the course of a court trial returned for a personal visit to the property in dispute; (2) traveled to the property by use of a private road as if it were a public road, when the extent of the permissible use of the road was an issue at trial; (3) in the course of the visit to the property undertook a further viewing by gaining entrance to a private dwelling on pretextual grounds; (4) initiated a conversation with the owner of the dwelling about the litigation; (5) failed to end the conversation when the owner offered information regarding the litigation; (6) failed to disclose his identity as the trial judge until he was preparing to leave the premises; and (7) failed to inform trial counsel of his visit or of his conversation. An objective observer reasonably might have disregarded the possibility that the judge, in good faith, might have forgotten the particulars of his site visit or the conversation that had taken place there. "The judge's lack of knowledge of a disqualifying circumstance . . . does not eliminate the risk that his impartiality might reasonably be questioned by other persons." (Internal quotation marks omitted.) *Liljeberg* v. *Health Services Acquisition Corp.*, supra, 486 U.S. 859. Considering the relevant factual showing in its

entirety, we are persuaded that a well informed, thoughtful and objective observer reasonably could decide that there was, in this case, a significant risk[15] of a judicial impropriety as defined by canon 3 (c) (1).

Although each case of alleged judicial impropriety must be evaluated on its own facts, the considerations that we have found decisive are similar to those articulated in cases in other jurisdictions. Some of the significant state court cases are reviewed in *In re Inquiry Concerning a Judge*, supra, 788 P.2d 722–23. At least since the decision of the United States Supreme Court in *Liljeberg* v. *Health Services Acquisition Corp.*, supra, 486 U.S. 860–61, federal courts have ruled to the same effect. See, e.g., *United States* v. *Jordan*, supra, 49 F.3d 156–57.

Considering the totality of the circumstances of this case, we conclude, therefore, that the judge improperly decided that his conduct did not create an appearance of impropriety and improperly denied the plaintiff's motion for disqualification on that ground. It follows that the plaintiff's motion for a mistrial likewise was denied improperly. The case must be remanded for a new trial.[16]

---

[15] "A reasonable observer is unconcerned about trivial risks; there is always *some* risk, a probability exceeding 0.0001%, that a judge will disregard the merits. Trivial risks are endemic, and if they were enough to require disqualification we would have a system of preemptory strikes and judge-shopping, which itself would imperil the perceived ability of the judicial system to decide cases without regard to persons. A thoughtful observer understands that putting disqualification in the hands of a party, whose real fear may be that the judge will *apply* rather than disregard the law, could introduce a bias into adjudication. Thus the search is for a risk substantially out of the ordinary." (Emphasis in original.) *In the Matter of Mason*, 916 F.2d 384, 386 (7th Cir. 1990).

[16] The defendants did not prevail on their special defenses claiming that the Science Center had acquired an easement by grant, implication or necessity. On appeal, the Science Center has renewed only its special defense of easement by implication. Katherine Vidal Smith, by contrast, renews only the special defense of easement by express grant. All the defendants also filed special defenses claiming laches and equitable estoppel. Because the

## II

In light of the need for a retrial, we have decided to provide guidance regarding one of the underlying issues of law that this case presents. The parties, in their arguments in this court, have taken diametrically opposed positions about the circumstances, if any, in which the benefit of an easement can accrue to property that was acquired by the holder of the easement after the creation of the easement. One way of articulating their disagreement is to ask whether recognizing rights to an easement that purports to benefit after-acquired property would always, as a matter of law, overburden the use of the servient property.

We will address this question on the assumption of certain apparently undisputed facts. We do not intend thereby to foreclose the trial court from making different findings or to foreclose the parties from making different arguments that may affect the significance of this question. In addition to the issues that we have addressed in this appeal, we reemphasize that all issues of fact remain to be resolved anew on retrial.

For present purposes, we assume that the Science Center will continue to claim that it has a right of access over Montevideo Road because, inter alia, it derived its title from an easement that, in 1955, the federal government acquired first by condemnation and thereafter by quitclaim deeds. The government used the property as a NIKE missile site from 1955 to 1967. In a lease executed on the same day that the government received

---

trial court did not reach the merits of any of these special defenses, they may be renewed at retrial.

Smith filed a counterclaim for damages on the ground that she had been sued wrongfully because the gravamen of the plaintiff's complaint was misconduct by the Science Center. Although the trial court agreed that Smith bore no liability, it awarded her no damages. Smith has not appealed the implicit denial of her counterclaim. It may, however, be renewed at retrial.

quitclaim deeds to the property, the government acquired the right to use adjacent land as a masking area.

The plaintiff does not deny that the 1955 easement is an easement appurtenant[17] that entitles the Science Center to use Montevideo Road for access to the so-called "federal parcel." What is in dispute is whether the Science Center may avail itself of the 1955 easement to access the area leased by the federal government, the so-called "masking area."[18] It is within the masking area that the Science Center has constructed a building containing administrative offices, classrooms, television studios and a planetarium. It currently uses both the federal parcel and the masking area to conduct its programs.

Assuming these to be the facts found on retrial, we will address three issues that are raised by the Science Center's alleged right to access Montevideo Road for the benefit of those of its activities that are located on the masking area. We will consider: (1) whether after-acquired property is excluded, as a matter of law, from the right of access previously obtained by an easement appurtenant; (2) in the absence of a per se exclusion, what is the test for determining the extent of the easement; and (3) in applying the proper test, what factual showing is required to determine whether an extended easement overburdens the servitude created by the original easement.

Relying on *Carbone* v. *Vigliotti*, 222 Conn. 216, 610 A.2d 565 (1992), the trial court resolved these issues in

---

[17] The parties agree that the easement is appurtenant. See *Branch* v. *Occhionero*, 239 Conn. 199, 203–204, 681 A.2d 306 (1996); Restatement (Third), Property, Servitudes (Tentative Draft No. 4) (1994) (officially adopted 1998) § 4.5.

[18] For present purposes, we assume that the masking area encompasses all of the after-acquired property that the Science Center seeks to access by use of Montevideo Road.

favor of the easement owner. In *Carbone*, this court upheld the right of an easement holder who built a house on property that straddled the line between property that he had owned previously and property that he acquired subsequently. Id., 225. We held that "the mere addition of other land to the dominant estate does not constitute an overburden or misuse of the easement." Id.[19]

The plaintiff urges us to reconsider the validity of that holding, in light of an earlier case, *Curtin* v. *Franchetti*, 156 Conn. 387, 389, 242 A.2d 725 (1968) (adhering to common-law principle that easement may become legally attached to dominant estate "only if the same person has unity of title to both the way and the dominant estate"), or, at least, to limit *Carbone* to its facts. The Science Center, to the contrary, maintains not only that *Carbone* was decided properly, but also that it reflects the present day understanding of the law of easements and servitudes contained in the Restatement (Third) of Property, Servitudes. We agree with the Science Center.

It is important to clarify exactly what this court held in *Carbone*. We did not hold that an easement of access attaches automatically to after-acquired property. Indeed, we did not challenge the general rule that the default position is to the contrary. See *Ozyck* v. *D'Atri*, 206 Conn. 473, 479, 538 A.2d 697 (1988) (recognizing that there may be circumstances in which intent of original grantor in creating easement supersedes unity of title rule, but deferring reconsideration of *Curtin*). In *Carbone*, we also recognized, however, that, in some circumstances, the parties at the time of the creation of an easement may be found to have contemplated,

---

[19] The trial court made factual findings about the extent to which the use of the easement by the Science Center imposed an overburden on Montevideo Road. Because definitive fact-finding must await retrial, we are not reviewing that aspect of the trial court's decision.

as a matter of law, that its benefits might accrue to adjacent property that was not formally within the terms of the easement. *Carbone* v. *Vigliotti*, supra, 222 Conn. 225. The nub of our holding was to reject a bright-line rule that permitting adjacent after-acquired property to benefit from an easement of access automatically constitutes an overburden or misuse of the easement. Id. We adopted instead the principle that the construction of an easement requires inquiry into the intent of the parties when the easement was created. Id. To determine that intent, we held, a court reasonably may take into account the proposed use and the likely development of the dominant estate. Id., 224–25. Under no circumstances, however, could an easement be construed to encompass after acquired property if the result would be a material increase in the use of the servient property. Id., 225.

*Carbone*, therefore, answers both of the issues of law that we have decided to address at this time. We reaffirm its well reasoned holding and decline to limit its rulings to its particular facts.

Our reaffirmation of *Carbone* finds support in the recently approved provisions of the Restatement (Third) of Property, Servitudes.[20] Those provisions adopt a contracts oriented view of the law of easements and servitudes. See Restatement (Third), Property, Servitudes (Tentative Draft No. 4) (1994), introduction, p. xvii. For example, § 2.1 of the Restatement (Third) provides that an easement and its accompanying servitude "may be created by contract or conveyance."[21] Section 2.2 of the Restatement (Third) provides in relevant part that

[20] The American Law Institute adopted the Restatement (Third) of Property, Servitudes in its entirety, subject only to editorial modifications, at its annual meeting on May 12, 1998. See 66 U.S.L.W. 2724–26 (May 26, 1998).

[21] Restatement (Third), Property, Servitudes (Tentative Draft No. 1) (1989) (officially adopted 1998) § 2.1 provides: "A servitude may be created by contract or conveyance."

"[a] contract or conveyance creates a servitude if it is intended to do so . . . ."[22]

Specifically relevant to this case, § 4.1 of the Restatement (Third) makes the intentions or the reasonable expectations of the parties the overarching consideration in the construction of a servitude.[23] Only if the rules of § 4.1 are not fully applicable do supplemental principles, set forth in §§ 4.10 and 4.11, provide additional guidance. Subject to the proviso that the servitude beneficiary is not entitled to cause unreasonable damages to the servient estate, or interfere unreasonably with its enjoyment, § 4.10 permits the beneficiary of an easement "to make any use of the servient estate that is reasonably necessary for the convenient enjoyment of the servitude for its intended purpose. The manner, frequency, and intensity of the beneficiary's use of the servient estate may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefited by the servitude. . . ."[24]

---

[22] Restatement (Third), Property, Servitudes (Tentative Draft No. 1) (1989) (officially adopted 1998) § 2.2 provides: "A contract or conveyance creates a servitude if it is intended to do so, and if it is otherwise effective to create a servitude. The intent to create a servitude may be express or implied. No particular verbal formula is required."

[23] Restatement (Third), Property, Servitudes (Tentative Draft No. 4) (1994) (officially adopted 1998) § 4.1 provides: "Interpretation of Servitudes

"(1) A servitude should be interpreted to give effect to and be consistent with:

"(a) the intentions of the parties to an expressly created servitude;

"(b) the intentions or reasonable expectations of the parties to a servitude created by implication, necessity, or estoppel; and

"(c) the reasonable expectations of the party against whom a servitude is created by prescription.

"(2) A servitude should be interpreted to carry out the purpose for which it was created.

"(3) To the extent not inconsistent with the interpretation arrived at under subsections (1) and (2), a servitude should be interpreted to avoid violating public policy. Among reasonable interpretations, that which is more consonant with public policy should be preferred."

[24] Restatement (Third), Property, Servitudes (Tentative Draft No. 4) (1994) (officially adopted 1998) § 4.10 provides: "Use Rights Conferred by Easements and Profits

Section 4.11 cautions that "[t]he beneficiary of an appurtenant easement or profit is not entitled to use the servient estate for the benefit of property other than the dominant estate."[25]

Taken in their entirety, the rules of the Restatement (Third) persuade us of the continued vitality of our decision in *Carbone*. At the retrial, unless our factual assumptions are found to be inaccurate, the governing principles stated in *Carbone* should be applied. In applying these principles, however, the trial court should be mindful of the fact that the federal government originally acquired its fee interest in the property by conveyances that resulted from its exercise of its right of eminent domain and yet, simultaneously, acquired its leasehold interest in the disputed masking area by a consensual agreement.[26] It also should be mindful that the relevant intent must be determined by examination of the relevant documents at the time of the original conveyance and leasehold.[27]

"Except where application of the rules stated in § 4.1 leads to a different result, the beneficiary of an easement or profit is entitled to make any use of the servient estate that is reasonably necessary for the convenient enjoyment of the servitude for its intended purpose. The manner, frequency, and intensity of the beneficiary's use of the servient estate may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefited by the servitude. The rules stated in this section are subject to the proviso that the servitude beneficiary is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment."

[25] Restatement (Third), Property, Servitudes (Tentative Draft No. 4) (1994) (officially adopted 1998) § 4.11 provides: "Appurtenant Easement or Profit Limited to Serving Dominant Estate

"The beneficiary of an appurtenant easement or profit is not entitled to use the servient estate for the benefit of property other than the dominant estate."

[26] The principles of the Restatement (Third) encompass both conveyances and contracts, and thus do not categorically exclude property acquired other than by contract. See Restatement (Third), Property, Servitudes (Tentative Draft No. 1) (1989) (officially adopted 1998) § 2.2.

[27] These documents include, inter alia, the June 27, 1955 judgment on declaration of taking, the July 28, 1955 amended judgment on declaration of taking, the November 22, 1955 quitclaim deed from the Hartford Times, and the lease from the Hartford Times.

The judgment is reversed and the case is remanded for a new trial.

In this opinion KATZ, PALMER and MCDONALD, Js., concurred.

BERDON, J., dissenting. I agree with the majority that the trial court in this case, Judge Satter, did not view the site for the purpose of an ex parte investigation of the facts disputed at trial. I also agree that Judge Satter, however, should not have visited the site for any purpose. At the hearing on the motion for recusal, Judge Satter candidly admitted that he "shouldn't have gone up there . . . ." Nevertheless, I am unable to conclude that his conduct, under the circumstances, reached a level that required recusal. Simply put, Judge Satter's Sunday afternoon excursion, embarked upon for the purpose of showing to his wife the beautiful view from the top of the mountain, did not constitute conduct sufficient to lead "a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned . . . ." (Internal quotation marks omitted.) *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 745–46, 444 A.2d 196 (1982). Indeed, as the majority points out, any information he received from the visit was favorable to the plaintiff, Abington Limited Partnership.

Previously, this court has not lightly presumed that a reasonable person, knowing all of the surrounding circumstances, would reasonably question the impartiality of a judge in light of those circumstances. The *Papa* case is illustrative. *Papa* involved two separate, unrelated motions for recusal. In the first motion, the defendants, who were teachers engaged in an illegal strike, argued that the impartiality of the trial judge reasonably could be questioned as a result of the fact that the judge had made public comments critical of illegal teachers' strikes at a conference a short time

prior to the initiation of the case pending before him. Id., 740–42. This court, holding that recusal was not required because the comments did not raise a reasonable doubt as to "whether the judge had prejudged . . . [the] impending case"; id., 743; concluded that the defendants' motion properly had been denied. Id., 746.

In reviewing the trial court's denial of the second motion for recusal in *Papa*, this court determined that the motion should have been granted based upon the trial judge's inclusion in the record of unsubstantiated findings supported only by the judge's own personal knowledge. Id., 753. The motion for recusal was filed following the trial judge's participation in an interview with a news reporter regarding the pending case. The newspaper article that followed the interview quoted the judge as having made numerous negative comments about the defendants in the case. Id., 748–49. This court determined that, although a judge need not necessarily be disqualified for making public comments about a pending case, recusal was required under the circumstances because of the judge's conduct subsequent to the interview. Id., 747–48. Following the defendants' filing of the motion for recusal, the judge included four pages of factual findings in the record regarding the interview and the statements that he made that were not substantiated by any evidence before the court. Id., 750–51. This court determined that the inclusion of such findings was obviously improper, and that in making the findings the judge had, in effect, made himself an unsworn witness to material facts not subject to cross-examination, and demonstrated a personal involvement with the case that would lead one reasonably to question his impartiality. Id., 751–53.

In my view, the facts of this case simply do not rise to a similar level as in *Papa* that would lead a reasonable person to conclude that Judge Satter's impartiality should be questioned. First, it must be kept in mind

that a full hearing to determine exactly what had occurred with respect to Judge Satter's visit to the site was held and the facts gleaned from that hearing were undisputed. Judge Satter's purpose for visiting the site, as indicated previously, was to show to his wife the views from the top of the mountain that he had seen on two previous occasions when he visited the site with the parties involved in this litigation. As a consequence of the visit with his wife, no additional information or evidence about the litigation was obtained that Judge Satter did not already have before him. Judge Satter did gain access to the home of James W. Tilney while on the mountain under the pretext that he was responding to a "For Sale" sign on the house, however, Tilney was not involved in the litigation. Furthermore, in the conversation that Judge Satter initiated with Tilney by commenting that he understood that there was litigation involving the road leading to the property and without identifying himself as the trial judge, Tilney responded in a manner favorable to the plaintiff. Unless one could conclude, therefore, that Judge Satter engaged Tilney in a conversation for the purpose of obtaining negative evidence about the plaintiff's cause of action, which even the plaintiff in this case does not contend, it is not reasonable to question the judge's impartiality under these circumstances.

As a result of the majority's decision, the nine parties involved in this case, represented by six law firms, will be required to relitigate the entire matter, incurring significant expenses for legal fees and other costs of litigation.

I also do not join in part II of the majority opinion— an advisory opinion on the law of easements. Cases involving property law involve fine distinctions that should not be decided in a factual vacuum.

Accordingly, I dissent.