[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The above-captioned case, referred to this court for a new trial after the Supreme Court set aside the judgment from the CT Page 5492 first trial, Abington Ltd. Partnership v. Heublein, 246 Conn. 815
(1997) ("Abington I"), concerns the claim of the plaintiff that is a servient landowner and that the dominant landowner is impermissibly using an access easement over its land to reach land added to the parcel for which the access easement was allegedly created.
During retrial, the parties agreed to an amendment of the complaint. In the first count of the amended complaint, the plaintiff seeks a settling of title. The plaintiff alleges trespass in the second count, misuse of the easement in the third count, and overburdening of the easement in the fourth count. (Penned changes in the fourth count reflect agreements made on the record in open court, and the penned changes are therefore part of the operative complaint.)
The amendment of the complaint reflects the fact that during the course of the trial the plaintiff withdrew claims against Katherine Vidal Smith, who had been identified as the party who sold the servient estate to the plaintiff's predecessor in interest, and against other parties who had been alleged to have been impermissibly using the same access route, including Bruce Gilbert Heublein.
Abington Limited Partnership, an entity owned and controlled by Michael Konover, owns a ninety-six acre piece of property on Talcott Mountain. The Abington land is located partly in the town of Avon and partly in the town of Bloomfield. The defendant Talcott Mountain Science Center for Student Involvement, Inc. ("science center") is a nonprofit educational institution created in 1965. It operates a science academy on Talcott Mountain for approximately sixty high school students selected for their high level of ability and interest, and it creates and broadcasts educational programs concerning meteorology and astronomy to other schools. The science center also conducts educational programs for students from several public school systems, plus Saturday and summer programs for interested children of school age. The science center has a communications tower on which are located equipment of various lessees: defendants Metro Mobile CTS of Hartford, Inc., Arch Communications Corporation, Chase Family Limited Partnership No. 7, Hartford Television, Inc., and The New England Weather Service, Inc. ("the lessees"). Other proceedings have established that these activities are incidental to the science center's educational purposes. CT Page 5493
The science center began its activities and programs in 1970 on a 6.34 acre site that had formerly been the radar tracking installation for a Nike missile facility operated by the federal government from 1955 until 1967. This site, which has been referred to throughout the trial as "the federal parcel" was acquired by the federal government upon a declaration of taking filed in United States District Court (D. Conn. at Hartford) on June 3, 1955. (Ex. 111.) The same declaration of taking listed, among the various parcels taken by eminent domain, three easements leading over roads from the federal parcel. Two of these easements provided access over a private road known as Montevideo Road on land now owned by Abington to Route 44, which is also known as Albany Road or Albany Avenue. In 1967 the federal government conveyed to the Town of Avon the interests it had taken by eminent domain. (Exs. 327 328.) The science center acquired the Abington easements from the Town of Avon at the same time that it acquired the federal parcel in June 1975. (Exs. 329 330.)
Description of the Properties at Issue
In 1980 the State of Connecticut conveyed to the Science Center a 13.8 acre parcel of land abutting the 6.34 acre federal parcel. (Ex. 341.) Initially, the science center conducted classes and other educational projects in renovated and expanded Nike site buildings. In 1989, at a cost of $2.6 million the science center built an additional building on its newly acquired land, which has been referred to as "the state parcel." Since the completion of that building in approximately 1991, the Science Center has used the access road over Abington's land to reach its buildings and conduct its activities on both the state and federal parcels. The lessees' equipment is located mostly on the federal parcel; however, data are transmitted from that equipment to facilities located in the new building on the state parcel.
The science center claims a right to vehicle access to both the state and federal parcels over the road on the Abington property leading to Route 44. The science center asserts that its right derives from two sources: 1) the easements taken by eminent domain by the federal government and 2) a pre-existing access right of Robert Hoe to the area now referred to as the state parcel, which the defendants assert that Hoe retained when he conveyed what is now the Abington parcel to a predecessor owner, Cornelia Whitehead, in 1890. The science center also has raised as a special defense a claim of laches against the plaintiff. CT Page 5494
Abington (under a prior name) acquired the land over which the access road runs in 1987 after the land had been purchased by another entity, Janney Realty Corp., with the plan of immediate transfer to Abington. The grantor to Janney Realty Corp. was Katherine Vidal Smith, who owned the Abington parcel at the time of the federal taking of the easement in 1955. Smith lived at times in a large house that overlooked Hoe Pond and at times in one of the smaller houses located on the property. At times, these smaller houses were rented to tenants. Smith and her tenants all reached their houses by the private road, known as Montevideo Road, that ends at Albany Road.
At the south end of Hoe Pond, a driveway leads north to the Heublein Tower, an edifice now located on land owned by the State of Connecticut. This driveway, approached from Route 44 via Montevideo Road, is used only by state vehicles for maintenance of the tower, and the end of the driveway near the pond is blocked by a locked gate. The public is permitted to reach the tower only by foot up an unpaved trail that starts at a short paved road leading to the Simsbury Road, Route 185, and leads upward over stony ground through trees along the flat top of a ridge with expansive views over the Farmington Valley on the way to the tower.
From the south end of Hoe Pond, the private road known along some of its length as Montevideo Road continues uphill to the right towards the federal parcel, which is located on the flat rocky top of a plateau-like promontory. This portion of the roadway continues on past the federal parcel to the state parcel and to residential properties along the same rock formation, which is referred to as "Gibraltar."
The defendants have referred to the portion of the route that starts near the south end of Hoe Pond as Gibraltar Road. The route over Montevideo Road and Gibraltar Road is the only existing vehicle access to the state and federal parcels now owned by the science center. Abington has granted easements over the entire length of the roadway out to Route 44 to the residential property owners whose properties are near the science center property. Abington is the fee owner of the land over which Montevideo Road and Gibraltar Road are located from Rte. 44 to the points of access to the science center's state and federal parcels. The driveway to the science center has been relocated so that vehicles now enter the science center property on the state CT Page 5495 parcel portion. The former driveway, which extended into the federal parcel from Gibraltar Road, has been closed with a gate.
At the urging of the parties, the undersigned and a court officer viewed the property at issue and the roadways at issue, driving the length of Montevideo Road and Gibraltar Road up to the federal and state parcels and walking to the Heublein cottage beyond the state parcel. This viewing included walking from the Heublein Tower down the trail to the north to reach the small access road at the foot of the hill, leading to Route 185.
Michael Konover razed the large house that had been occupied by Katharine Vidal Smith and built another house on that location, where he now resides. That house was not visible from Montevideo Road in mid-April, with the trees in bud but without full foliage. The court concludes that vehicles passing from the science center out to Rte. 44 would not be visible from the Konover house, though they might be audible. The court was not requested to view the road from the area of the Konover house nor was it presented with any photographs to indicate what can be seen from that location.
The Science Center's Right of Access on the Basis of the FederalEasements
The issue raised by the first count of the complaint is whether the science center and its tenants have the right of vehicle access over Abington's property to reach the state parcel. Abington has stated on the record that it concedes that the science center has an appurtenant access easement to the federal parcel by virtue of the easements obtained by the federal government in 1955 by eminent domain and passed down to the science center through its chain of title. Abington asserts that the science center's activities on the state parcel are much more extensive in scope and in frequency than its activities on the federal parcel alone, and that use of the easement to achieve access to the after-acquired state parcel is an impermissible burdening of the easement that it characterizes as being appurtenant to the federal parcel.
In ordering a new trial, the Supreme Court undertook to "provide guidance regarding one of the underlying issues of law that this case presents." Abington I, supra, 246 Conn. 827. Noting that the vitality of its ruling in Carbone v. Vigliotti,222 Conn. 216 (1992), was likely to be an issue on retrial, the CT Page 5496 Court reaffirmed the holding in Carbone that "the mere addition of other land to the dominant estate does not constitute an overburden or misuse of the easement." Abington I, supra,246 Conn. 829, quoting Carbone v. Vigliotti, supra, 222 Conn. 225. The Supreme Court stated that in Carbone it "adopted instead the principle that the construction of an easement requires inquiry into the intent of the parties when the easement was created," and stated that the trial court "reasonably may take into account the proposed use and the likely development of the dominant estate." Abington I, supra, 246 Conn. 830. The Court cautioned that "[u]nder no circumstances, however, could an easement be construed to encompass after-acquired property if the result would be a material increase in the use of the servient property." Id., citing Carbone v. Vigliotti, supra,222 Conn. 225.
The Supreme Court stated in Abington I that "[s]pecifically relevant to this case, § 4.1 of the Restatement (Third) of the Law of Property (Servitudes) makes the intentions or the reasonable expectations of the parties the overarching consideration in the construction of a servitude," noting that "[o]nly if the rules of § 4.1 are not fully applicable do supplemental principles, set forth in §§ 4.10 and 4.11, provide additional guidance." Abington I, 246 Conn. 831.
The servitude at issue was created in 1955 when the United States of America filed a complaint, Civil Action 5456, in the District Court of the District of Connecticut, declaring a taking of several parcels of land, including the fee to the "federal parcel," which was owned by the Hartford Times, Inc. an access easement over Gibraltar Road, a spur road off Montevideo Road that was owned by The Hartford Times, Inc. (Tract A-102E-4) and two access easements over the land of Katherine Vidal Smith (then known as Katherine Vidal), identified as Tracts A-103E-1 and A103E-2. (Ex. 100.) The descriptions of these two tracts in attachments to the complaint indicate a twenty-four foot strip running from the access easement taken by eminent domain from The Hartford Times east then south to Albany Avenue (Rte. 44). The government identified 40 U.S.C. § 257 as the authority for the taking and stated at paragraph 3 of the complaint that "[t]he use for which the property is to be taken is for military purposes." In the Declaration of Taking, Ex. 111, the Secretary of the Army indicated that the public uses for which the land was being taken were military uses to provide for facilities for the army "and for such other uses as may be authorized by Congress or by CT Page 5497 Excecutive Order." The declaration indicated that the taking of the easement over the Vidal land was "perpetual and assignable."
The record of the proceeding indicates that the government deposited $1,000 as compensation to Vidal for the easements (Ex. 104) but that later, in April 1959, the government moved for an order adjudging just compensation to be $3,000. and ordering payment of that amount to Vidal, "in care of her attorney, James H. Throwe, Esq." (Ex. 110.) The motion refers to an agreement between the government and Vidal in which she accepts $3,000 as just compensation for the easements over her property acquired by the government. (Ex. 110.)
The record of the federal taking proceeding includes no motions or other papers filed in federal court on behalf of Vidal. The fact that government filed the motion to increase the compensation based on an agreement with Vidal, and the mention of Attorney Throwe leads this court to infer that Vidal negotiated for and obtained additional compensation for the easements, and that the adjustment was achieved without the need for a contested hearing over fair compensation.
The Supreme Court stated in Abington I, supra, 246 Conn. 831, that on retrial this court should regard "the intentions or reasonable expectations of the parties the overarching consideration in the construction of the servitude," because a "contracts oriented view of the law of easements and servitudes" is appropriate. Abington I, supra, 246 Conn. 830-31.
The Supreme Court did not, in Abington I, discuss the issue, raised by the defendants on retrial, concerning possible differences in approach to determination of intent applicable to easements taken by the federal government's exercise of eminent domain as opposed to private easements created by contracts negotiated by the parties. Unlike the situation in which an easement is created by contract, the issue of the "intent of the parties" where the easement is created by the exercise of the federal power of eminent domain involves the federal government's rights under the taking statutes on which the taking was based, 40 U.S.C. § 484(k) and 258a. In the absence of any express language in the declaration of taking and judgment limiting the government's rights, it seems logical to infer that when an agency of the federal government exercises its power of eminent domain, its intent is to exercise the full extent of its statutory power, without any limitation not expressed in the text CT Page 5498 of the declaration of taking. There is no evidence that the federal government ever represented to Smith that the easement right would be exercised in any manner more restricted than the text of the description of the easement and access rights taken, which were identified in the declaration of taking as "perpetual and assignable." Use of the word "perpetual" negates any intent that the duration was limited, a clear indication that the parties had no intent that the easements would revert to the serviant estate if a particular use was terminated. Use of the word "assignable" negates any intent that the use would be confined to the particular use to which the government might initially put it. At the time of the taking, a federal statute, 40 U.S.C. § 484(k), specifically authorized transfer of interests in land taken by eminent domain by the federal government to be conveyed for use by educational institutions, including nonprofit educational institutions.
The federal government identified a military purpose as its public purpose for taking the easements over Gibraltar Road and Montevideo Road; however, nothing in the declaration of taking or the judgment thereon limited its use of the easements to any particular purpose. The recitation of a particular purpose in a declaration of taking has been held not to limit the use the federal government may make of a property. United States v.Sixteen Parcels of Land Located in City Block No. 193,281 F.2d 271 (8th Cir. 1960). Moreover, where a federal easement is described as perpetual, it is not to be construed as subject to reverter to the owner from whom it was taken by eminent domain.United States v. 434.00 Acres of Land, 792 F.2d 1006, 1010 (11th Cir. 1986).
The Vidal easements were listed in a declaration of taking that also included other parcels, including the six-acre tract referred to as "the federal parcel." Each interest that the government sought to condemn is separately set forth in complaint by which the eminent domain proceeding was initiated (Ex. 100). The description of parcels A-103E-1 and A103E-2 appended to the complaint does not describe the easements as being appurtenant to the six-acre parcel designated as A-102. In fact, the easement rights were acquired from Katherine Vidal Smith and an apparent co-owner before the six-acre parcel was acquired not from Smith but from The Hartford Times, Inc. The separate acquisitions of the easements and a tract to which the easements gave access is significant. While Abington characterizes the access easements as appurtenant to the six-acre parcel, that parcel was not acquired CT Page 5499 from Katherine Vidal Smith, but from another owner. The text of the easement interests sought in the declaration of taking and described in the federal court judgment does not, moreover, state the easements are appurtenant to parcel A-102, the six-acre parcel. The easements identified as A-103E-1 and A-103E-2 do not provide complete access to the 6.34 acre parcel since the Smith property did not directly abut the federal parcel at the route of the road; rather, the Smith easements led to the easement taken from the Hartford Times, parcel A-103E-4, which covered the remaining distance to the federal parcel.
Since the federal government was negotiating to lease additional land of about five acres around the six-acre parcel during the same time period that the condemnation proceeding was pending, it is reasonable to infer that the government intended to use the access easements to reach whatever land it saw fit to acquire in the vicinity of the top of the plateau, whether by eminent domain, by lease, by permission or otherwise. The government obtained no separate easement by which to reach the leased masking area and, one can reasonably infer, to venture beyond the perimeter to meet and turn away any trespassers who approached too closely to the military installation.
The Supreme Judicial Court of Massachusetts has ruled, in a case involving a pipeline easement taken by the federal government and then conveyed to another party, that federal law, not state common law, applies to easements acquired by the federal government. Boorstein v. Mass. Port Authority,345 N.E.2d 668 (1976). That court cited United States v. 93.970 Acres ofLand, 360 U.S. 328, 332-333, 79 S.Ct. 1193 (1959); State Box Co.v. United States, 321 F.2d 640, 641 (9th Cir. 1963), UnitedStates v. Certain Interests in Property, 271 F.2d 379, 384 (7th Cir. 1959), cert. denied 362 U.S. 974 (1960), United States v.Kansas City, Kan., 159 F.2d 125, 129 (10th Cir. 1946). The United States Supreme Court stated in U.S. v. 93,970 Acres of Land, supra, 360 U.S. 332, that condemnation involves essential government functions, and that where essential interests of the federal government are concerned federal law governs unless Congress chooses to make state law applicable.
The declaration of taking at issue in Boorstein described the pipeline easement as "to be used as a pipe line right of way in connection with the Naval Fuel Depot." The parcel that had been the Naval Fuel Depot was conveyed to a private party that built a hotel on it and did not use the pipeline easement, which was CT Page 5500 conveyed by the federal government to the Massachusetts Port Authority. The plaintiff argued that the easement was appurtenant to the Naval Fuel Depot; however, the Supreme Judicial Court rejected that claim, stating that "the fact is that the Federal government acquired a broader interest in the land now owned by the plaintiffs. Boorstein v. Mass. Port Authority, supra, 345 N.E.2d 689. The court in Boorstein held that the federal government effectively sold the easement separate from its interest in the land that had been the depot, since by the terms of the taking, the easement was "perpetual and subject to transfer," 345 N.E.2d 670, as is the easement at issue in the case before this court. The result in the Boorstein case was that the easement could be used to benefit the uses of an entirely different property than the one to which it had originally provided access. The Supreme Judicial Court rejected the plaintiff's claim, the same claim that the present plaintiff makes, that the easement could not be used for the benefit of land other than what the plaintiff sought to characterize as the dominant estate, that is, the naval fuel depot land.
In LaFargue v. United States, 4 F. Sup.2d 593
(E.D.La. 1998), a federal district court ruled that easements and rights of way obtained by the federal government may be sold separately from any dominant estate that the easement originally benefitted [benefited], and that state law treating such easements as appurtenant or "predial" and not as separate interests in land are inapplicable because of their interference with federal interests and intentions. The court noted that the government's intentions and interests were to be determined from the text of documents creating the easements, and that the text did not indicate that the pipeline easement would be deemed abandoned if the oil facility to which the pipeline led was shut down. Id., 604.
The court in LaFargue concluded, however, that the easement at issue was a separate interest in land, not a predial (appurtenant) interest linked to the existence of a particular dominant estate, since the document creating the easement contained no mention of a dominant estate in connection with the easement. In the instant case, the description of the easement at issue likewise does not contain any reference to a specific dominant estate. The court in LaFargue found great significance in the fact that the easement was described as perpetual and assignable, as is the easement at issue in the case before this court. It rejected the claim of the servient landowner that the pipeline easement could not be sold to a new entity for CT Page 5501 transportation of natural gas, a use different from the original use for transportation of crude oil. The court granted summary judgment in favor of the government and the natural gas company that had purchased the easement.
Federal courts have also rejected the view that the party from whom the federal government takes an interest in land by eminent domain may, by expressing intentions or expectations, limit the government's use of the interest, even where the party from which the interest is taken is a State. United States v.Sixteen Parcels of Land Located in City Block No. 193, supra281 F.2d 271. The Eighth Circuit ruled in that case, 281 F.2d 274, that the "mere expression of the purpose for which property is being taken, in the provisions of a federal enabling act, or in the recitations of a state consent statute, or in the allegations of a condemnation complaint, ordinarily constitutes simply an indication of the warrant for the condemnation, and it does not, without more, effect a dedication of the property to the use or purpose for which it is immediately taken."
There does not seem to be any guiding precedent to suggest that Connecticut's courts should, regardless of the reasoning of other courts concerning a federal law of disposition of easements acquired by the exercise of federal eminent domain, regard such interests as standing on the same footing as private easements created by contracts between private parties. If such were the case, however, the evidence of the federal government's intention is the complaint and declaration in the taking and the judgment, which indicate that the easements over Gibraltar Road and Montevideo Road were taken not only for military purposes but also for all other purposes for which Congress authorizes the taking of interests in land. In the declaration of taking (Ex. 111), the government described the access road easements as "perpetual and assignable."
Katherine Vidal Smith did not testify, nor did any of the lawyers whose names appear in the federal court record concerning the condemnation proceedings. There was therefore absolutely no direct evidence presented to this court concerning any intention or any expectation that either the taker of the easement or Smith had at the time of the taking. Tenants of Smith offered testimony concerning her statements between 1969 and 1974 that she hoped that the easement would revert to her if the military use of the top of the hill ceased, and her wish to have the easement used as little as possible to protect her privacy and the tranquility of CT Page 5502 her property. Such hopes are contrary to the description of the easements in the federal court filing as "perpetual and assignable." Unlike the easement at issue in LaFargue, the description of the easement contains no conditions that will trigger reverter. It can hardly be supposed that the parties agreed to limit the government's interest but failed to seek a reflection of such a limitation in the judgment, especially since Smith was represented by counsel.
A document from the records of the federal Property Management and Disposal Service (Ex. 460), dated September 22, 1966, indicates that Smith had inquired about a reversion to her of the easement after the Nike operation was closed, but that the federal government concluded that it would be contrary to its own best interests, since a sale to the Town of Avon for educational use was in process and the government officials felt they "must proceed as planned to ensure availability of access to the land in question so that the proposed conveyance to the Town can be accomplished." The Property Management Director noted that rather than making the right of way available to the government at no cost with a right of reverter, "Vidal [as Smith was then named] was paid $3,000 for the release of the interests we assume must have been considered adequate compensation for a permanent release in those days."
The evidence, moreover, includes indications that the government expected to use the access easement obtained from Vidal as access for its activities not only on the acreage whose fee it had also taken in the same federal court proceeding as the easements, but also for its use of leased land on the margins of that tract. The federal government leased from The Hartford Times, Inc. some additional land around the boundaries of the parcel it had condemned for the military installation on the top of the plateau. The declaration of taking listing the access easements over Montevideo and Gibraltar Roads was filed in June 1955. The date of the lease of the surrounding land is November 22. 1955, almost exactly one month before the government moved in the federal taking proceedings for an order of distribution of funds to Vidal.
It cannot be supposed that the government leased this area, which was denominated a "masking area," with the expectation that it would have no way of setting foot on it if a need arose. Since the only access to that area was from the federal parcel itself, which was to be reached by the access easement, it seems plain CT Page 5503 that the federal government expected to reach the leased land around the federal parcel either from the federal parcel or directly from Gibraltar road. Though Smith responded to a request for admission to the effect that she had been unaware of the lease for the land surrounding the federal parcel, the evidence establishes that the lease was entered on the land records of the Town of Avon on November 22, 1955, thus putting her on notice that the federal government's use of the access easement would be to reach a facility that would include use of both the parcel taken by eminent domain and leased land abutting it.
The plaintiff makes the point that this lease was not recorded in the chain of title of Abington. This argument does not seem to be entitled to much weight in view of the fact that the Connecticut Supreme Court's analysis in Carbone v. Vigliotti, supra, 222 Conn. 216, recognized an access easement to after-acquired property not in the chain of title of the servient estate.
The land leased by the federal government in 1955 around the borders of the federal parcel was less extensive than the "state parcel" purchased by the science center. Since, under the case law cited above, an easement acquired by the federal government through eminent domain may be independent of, rather than appurtenant to, another parcel, this fact is not significant.
On its face, the easements taken by the federal government are not restricted to those necessary to conduct particular activities on a particular tract to which the road subject to the easement led. There is no evidence that the federal government obligated itself to any limitation of its functions or that it made any representations to Smith that the operation of a radar site would entail only limited use of the road. It can hardly be supposed that the federal government's ability to conduct Cold War military operations could be restricted by the expectations of Smith as a landowner, and the terms of the taking support no such conclusion. It must also be remembered that the easements taken from Smith did not provide a complete route to the federal parcel but that they stopped at land then owned by The Hartford Times, Inc., over which the government likewise took an easement. Parcel A-103E-4. The gap between the road on the Smith property and the federal parcel supports the construction that the government took the Smith easements to reach whatever interest lay beyond them, including the Hartford Times land over which it acquired an easement. The portion of the Hartford Times property CT Page 5504 described as parcel A-103E-4 is part of the state parcel.
The plaintiff has presented testimony concerning the extent of traffic generated by the Army's radar installation; however, the fact that the government may have used its easement to a particular extent does not establish that it had created any expectation or expressed any intention at the time the easement was created that it would not to use it to a greater extent if its needs so required.
The plaintiff has not proven that the easements at issue were appurtenant to any particular tract, and federal condemnation law suggests that they should not be so construed, where, as here, the declaration of taking does not identify the easements as appurtenant and where they lead not to a particular parcel but to land of a third party. The plaintiff has not proven the existence of any intention or expectation shared by the federal government and Smith that can reasonably be relied on by this court to limit the broad powers and rights indicated by the documents effectuating the federal taking. Accordingly, the plaintiff has failed to prove that the use of the easement is limited to access to any particular tract of land, and it is not entitled to the relief sought.
To the extent that state law would fail to recognize an easement that is not appurtenant, federal law must be followed to give effect to a "perpetual and assignable" interest.
The Science Center's Right of Access on the Basis of anAppurtenant Easement
Even if, contrary to the case law cited above, the easements defined in the federal taking were seen as appurtenant to the federal parcel taken by eminent domain from a different landowner, the plaintiff has not demonstrated entitlement to relief. In Abington I, the Supreme Court stated that servitudes should be analyzed according to the principles of the Restatement of the Law of Real Property (Third) Servitudes. Section 4.1 of this portion of the Restatement, which was adopted in 1998 after a succession of tentative drafts, provides in applicable part that
(1) A servitude should be interpreted to give effect to and be consistent with: (a) the intentions of the parties to an expressly created servitude . . . (2) A servitude should be CT Page 5505 interpreted to carry out the purpose for which it was created. (3) To the extent not inconsistent with the interpretation arrived at under subsections (1) and (2), a servitude should be interpreted to avoid violating public policy. Among reasonable interpretations, that which is more consonant with public policy should be preferred.
At Comment (c) to the above text, the authors of the Restatement explain that "the intention of the parties to an expressly created servitude is ascertained from the servitude's language interpreted in light of all the circumstances." The language of the easement is the description set forth in the federal government's declaration of taking:
 A perpetual and assignable easement and right of way for the location, construction, operation, maintenance, patrol, replacement and/or removal of an access road, overhead pole and underground electric power and telephone lines, with all necessary fittings and appliances thereto, in, upon, under, over and across the land designated as Tracts Nos. . . . A-103E-1 and A-103E-2; together with the right to trim, cut, fell and remove therefrom all trees, underbrush and obstructions, and any other vegetation, structures, or obstacles within the limits of the right of way; reserving, however, to the landowners, their heirs, successors and assigns and to all persons legally entitled to the use of the existing road on Tracts Nos. A103E-1 and A-103E-2, the right to pass and repass over said road in such a manner as shall not interfere with the use thereof by the United States and reserving to the landowners their heirs, successors and assigns, all such uses, rights and privileges as may be exercised and enjoyed without interference with or abridgement of the easement hereby acquired by the United States.
The text of the easement does not contain limitations on use. The circumstances at the time were that the U.S. Army was planning to locate a Nike AJAX missile site at the base of Talcott Mountain and a radar site in aid of the missile site on the top of the ledge to which the access road led. The unusualness of this use thwarts an easy divination of any intent concerning the extent of use of the access road. An easement reserved for a residential lot allows a construction that an access road can be used for the uses widely known to be usual to a single family house. Military uses are not similarly CT Page 5506 susceptible to interpretations deriving from common knowledge. There is no evidence to suggest that the government described to Smith exactly what activities would take place at its radar installation. The phrase "radar installation" itself leads to the expectation that the uses would include radar dishes, towers and antennae, buildings, and personnel to operate and maintain the equipment. The kind of use of the access road easements could reasonably be expected to be army vehicles of all descriptions, including large trucks and equipment for installing, operating, guarding and maintaining radar equipment.
The size of the tract taken by eminent domain from another landowner at the top of the access road was in excess of six acres, a size that would lead to the expectation that the army could use the entire acreage for whatever purpose it chose, staffed at whatever level it chose, since the text of the easement contains no limitation on the amount of traffic. As has been discussed above, the contemporaneous leasing of land around the perimeter of the six-acre parcel indicated that the government expected to use the access easement to reach whatever functions it undertook, not only on the six-acre parcel, but on contiguous land in which it acquired an interest.
The reasonable expectation of a landowner whose property is taken for military use is that the military will make whatever use of that property that it chooses, and that it will potentially change that use as military objectives and technology progresses. Considerations of public policy favor allowing the military to make whatever use of its land interests that it finds prudent for national defense, a policy interest that unquestionably outbalances the privacy interests or expectations of residential homeowners with regard to the volume of traffic over a private road.
As has been discussed above, the existence of 40 U.S.C. § 484(k) further put landowners on notice that if the government chose to abandon interests in land taken for military purposes, it could be expected that the next use would be an educational institution. This statute likewise suggests a public policy favoring the use of land for educational facilities, especially where, as in the present case, the educational facility concentrates on activities which depend on the unique location of the property.
While the above analysis suggests that use of the access road CT Page 5507 easement to reach activities on the federal parcel was not limited in extent or scope, the issue, applying Carbone v.Vigliotti, supra, 222 Conn. 216, is the intentions and expectations of the parties with regard to use of the easement to reach after-acquired adjoining property. The contemporaneous lease by the government of the masking area around the federal parcel can logically be seen as demonstrating an intention to use the access road to reach whatever areas the government acquired, not only the federal parcel.
In Carbone v. Vigliotti, supra, 222 Conn. 216, the Supreme Court found that after-acquired parcels could benefit from an access easement that, by its terms, gave access only to specific parcels. The owner of the dominant estate could have built a two-family house on the parcel to which the easement applied. What he built on the larger parcel that included both the dominant estate and after-acquired abutting parcels was the same thing: a two-family house. Since the use thus corresponded to the use that was intended, the Court did not disapprove the use of the easement.
In the case before this court, the access easement allowed use of the road to reach whatever functions the government chose to engage in on the land it acquired, including land adjacent to the six-acre parcel. The evidence produced was to the effect that all of the uses that the science center makes of the combined state and federal tracts could have taken place on the federal parcel alone, though the costs of construction of the facilities would have been greater because of the terrain.
Over Burdening of the Easement
In Abington I, supra, 246 Conn. 829, affirming its holding inCarbone v. Vigliotti, 222 Conn. 216, the Connecticut Supreme Court stated that a party does not prove overburdening of an easement merely by showing that the easement appurtenant to one parcel of land is being used to reach an adjoining parcel. The Supreme Court directed that the essence of overburdening be assessed in light of the intent of the parties at the time the easement was created. The issues of intent that exist under a use an unusual as a military base, and the existence of a statute presaging future use for an educational institution have been discussed above.
On the issue of the claimed burdening of the easement after CT Page 5508 the new facilities were constructed on the state parcel in 1989-91, the parties submitted traffic studies prepared before and after the expansion. In 1987, a traffic study known as the Storch study counted 310 trips by vehicles over the access road in the course of a day. Traffic analysts who testified at trial agreed that it is a convention of traffic studies to ascribe ten trips per day to each single family residence on a road. Since the traffic counter in the Storch study was installed at the Route 44 end of the access road and there were 17 houses whose occupants would pass over the road to that point, traffic analyst Fred Greenberg credibly testified that the Storch study should reasonably be taken as indicating that in 1987, when all functions of the science center were confined to the federal parcel, the number of daily trips attributable to the science center was 140. In 1991, after the completion of the new building, Greenberg did a traffic count at a location beyond all but three of the private residences (thus obviating the need to reduce the count for trips by so many residential users) and found that the number of trips attributable to the science center was 142, roughly the same as before the new facilities were built. A repeated count in 1994 yielded the same result. The director of the science center, Donald LaSalle, explained that although the new construction added 20,000 square feet of interior space to the approximately 13,000 square feet of interior space on the federal parcel, the traffic stayed the same because the new facilities included equipment that allowed educational programs to be transmitted to schools, reducing the number of students visiting the center and because the science center tries to curtail the amount of traffic on the road.
The science center brings the students of the Talcott Mountain Science Academy to its facility by bus. The equipment owned by the lessee television and telecommunication interests were shown to account collectively for no more than two round trip visits by service personnel per month.
This court concludes that even if the access easement is seen as appurtenant, the use made of the easement in connection with after-acquired property of the same institution that conducted similar activities on the federal parcel has not been shown to have burdened the easement to an extent that could be characterized as exceeding the intentions and expectations of the parties at the time the easement was created, especially in view of the unusual uncertainty of the expected scope of use of the easement. CT Page 5509
Science Center's Right of Access from Reservation in the 1890 Deed
The Science Center claims that it has another source of right of access to the state parcel other than the right derived from the conveyance to it of the federal easements: its status as a successor in interest through the chain of title of the state parcel to the rights of Robert Hoe.
Both the state and the federal parcels currently owned by the science center and the land now owned by Abington, including the fee interest in Montevideo Road, were, in 1890, owned by Robert Hoe, a wealthy New Yorker who housed his mistress, Cornelia Whitehead, in the large house overlooking Hoe Pond, and visited periodically. The deposition transcript of a servant on the estate indicates that Hoe was married and that the relationship with Whitehead was "improper." In 1890 Hoe deeded to Cornelia Whitehead the fee to Montevideo Road and the land now owned by Abington, which includes the property west of the road, surrounding Hoe Pond. Hoe retained some property to the east of the road and the area to the north where a tower was located. The 1890 deed specifies that it is subject to the reservations and restrictions in an 1873 deed from David W. Bartlett to Henry C. Judd and in an 1877 deed in which the same grantor deeded another tract to the same grantee. Those reservations include the right of the grantor, "his heirs and assigns and his Tower visitors the right to pass and repass on foot and with carriages over said private way, the same to be 20 feet in width from the place where it leaves the Lake from the Albany Turnpike to the stone wall at the Cottage Gate thence to the Lake and on the borders of the Lake 12 feet in width and from the place where it leaves the Lake to the Tower 20 feet in width. Reserving also the right to take ice and water from the south end of the Lake at such place as may be designated by the owner for the Grantors private use and for his Tower business but not for public sale."
The 1890 deed was brief and informal, in that it described the property conveyed only by reference to descriptions in other deeds. It contained no express right to cross Whitehead's land that abutted the road in order to reach parts of the retained land other than the site of the tower. In 1894, Hoe created another deed for the same property, more formally drawn, and expressly reserving to himself, his heirs and assigns the right to use "the lake" and to grant to others the privilege of exit and entrance from both the south entrance and also "through the CT Page 5510 entrance from the Simsbury Road . . . and the right of way over the road heretofore described."
Whitehead did not record the two deeds until after Hoe's death in 1909. Hoe's heirs contested the transfer, and the case was settled by Whitehead's husband, Owen Roberts, after Whitehead's death in 1912. The Whitehead property was conveyed by Roberts and through other grantors to Katherine Vidal Smith. While the dispute over the 1890 and 1894 deeds to Whitehead was in progress, the Hoe estate deeded the land retained by Hoe, including the area to the east known as Gibraltar and the area to the north to G.F. Heublein, excepting those interests described in the 1890 and 1894 deeds to Whitehead. The Hoe-Heublein land passed in a series of conveyances to the Hartford Times, Inc. (the owner at the time the federal government took the six-acre federal parcel in 1955) to the State of Connecticut, which now owns the area to the north where the Heublein Tower is situated, and which conveyed the "state parcel" on Gibraltar to the science center in 1980.
When the Hoe estate settled the dispute with Roberts, it did so by conveying to him the property described in the 1890 deed, with no mention of the 1894 deed. The reservations incorporated in the 1890 deed preserved only the easement described in the 1873 Bartlett deed. The defendants assert that given the relationship between Hoe and Whitehead, the 1890 deed was not an arm's length transaction and that it seems very unlikely that the parties intended that Hoe would be able to use Montevideo Road to reach his property to the north, at the tower, but not to reach his other property that abutted the road. The problem with this argument is that Hoe did not use the road as the boundary line between his retained property and the tract he conveyed to Whitehead in the area where Gibraltar Lane is now located or in any area that would form a short route from the road up to Gibraltar. Though inspection of a map shows limited places in which the road is a boundary, these locations are not at junctures that form a logical route to Gibraltar, given the topography of the land, and the road is not used as a boundary in the actual location where Gibraltar Road joins Montevideo Road. In order to reach the Gibraltar area on the shortest route from Montevideo Road, Hoe would have had to proceed from the road south over part of the property he conveyed to Whitehead. Nothing in the words of the deed indicate retention of a right to do so.
At the time of the conveyance to Whitehead, Hoe had not CT Page 5511 erected any building or other structure in the area of Gibraltar. While it may be supposed, based on historical evidence that others walked up to the various ledges to admire the view, that Hoe did the same, no evidence was presented to take Hoe's activities with respect to the Gibraltar area out of the realm of speculation. While it seems reasonable to say that Whitehead would probably have allowed Hoe, given their relationship, to traverse her land to get to portions of his, that permission could well have taken the form of a license, rather than an easement running with the land and extending the same right to Hoe's successors in interest. Hoe set the boundaries of the property he conveyed to Whitehead in a manner that gave her an ownership interest in both sides of the road at the south end of Hoe Pond and did not use the road as a boundary in the area near the easiest, most direct approach to Gibraltar. The words of the easement incorporated from the Bartlett deeds do not indicate a right to reach other lands of the grantor, nor did Hoe include any such language in describing the reserved right to use the road. In such a situation, the Connecticut Appellate Court found no easement to pass over intervening land. Stiefel v. Lindemann,33 Conn. App. 799, cert. denied, 229 Conn. 914 (1994). The Connecticut Supreme Court has ruled that
 [F]or a determination of the character and extent of an easement created by deed we must look to the language of the deed, the situation of the property and the surrounding circumstances in order to ascertain the intention of the parties.
Mackin v. Mackin, 186 Conn. 185, 189 (1982), citing AmericanBrass Co. v. Serra, 104 Conn. 139, 142 (1926). The language of the 1890 deed does not describe the creation of an easement to cross the conveyed land to reach Gibraltar. It makes no mention of a road to Gibraltar. The surrounding circumstances were that there were no buildings at Gibraltar and no use there for which Hoe needed to reach it by road rather than by footpath from those parts of his land, notably, the tower, to which he had expressly reserved access by carriage. It is perfectly reasonable to construe the access easement as preserving only his ability to go to the only structure on his retained property by carriage, since there is no evidence of any use of the rest of the steep and rocky expanse, other than perhaps for recreational walking and sightseeing. The choice of boundaries for the conveyed property appears to have been Hoe's, and he did not preserve maximum access to the road for himself by using it as the boundary along CT Page 5512 all of its length, though he could have done so. Therefore, the science center has no right of access under the reservation in the 1890 deed.
Easement by Necessity
The science center asserts that an easement to reach Gibraltar by vehicle should be recognized as arising from necessity. It claims the necessity arose not at the time of the State's conveyance to it of the state parcel, but at the time of the conveyance from Hoe to Whitehead in 1890. An easement by necessity will be imposed where a conveyance by the grantor leaves him with an adjoining parcel which he can reach only through the lands conveyed to the grantee. Hollywyle Association,Inc. v. Hollister, 164 Conn. 389, 399 (1973); Collins v.Prentice, 15 Conn. 39, 44 (1942). The necessity need not be absolute, but only a reasonable one. Hollywyle Association, Inc.v. Hollister, supra, 164 Conn. 199; Marshall v. Martin,107 Conn. 32, 37 (1937).
Hoe did not, however, leave his retained parcel without access to a public road. He retained an express easement to his land at the site of the tower. From that point, he had access to the other portions of his retained property. He also had access to his property from the road to the north, Simsbury Road, Route 185. Though it does not appear that a road from the tower or Gibralter to Simsbury Road actually existed in 1890, engineering testimony indicates that it is possible to build a road to all pertinent portions of the retained property from Simsbury Road. While such a road would unquestionably be less convenient than Montevideo Road, the test for the recognition of an easement by necessity is not whether the existing access is the most convenient, but whether the retained parcel is left without access to a public road. Stiefel v. Lindemann, supra,33 Conn. App. 799; Schultz v. Barker, 15 Conn. App. 696, 701-02 (1988). The tract retained by Hoe had such access. The evidence does not support the science center's claim that the portion of the retained Hoe land that has been referred to as its state parcel is so cut off from the other portions by topography that it could not share in the access to Route 185. Hoe could likewise have built a driveway from Gibraltar to the tower, from whence he had use of Montevideo Road. James Luzzi, an engineer, testified that a road could be built from Route 185 to the state parcel of the science center. Mr. Luzzi's estimation of the cost of that road was based on current construction standards for public roads, a CT Page 5513 consideration not germane to the inquiry whether, in 1890, the Hoe conveyance left his property without access to a public road. The intent of the deed from Hoe to Whitehead is to provide access by road only to the sole structure on the retained land, and there is no evidence of any intention to reserve the ability to reach other portions of the retained land by road.
The segregation of the portion of the science center's holdings referred to as the state parcel was not, of course, caused by the conveyance from Hoe to Whitehead, but by the conveyance from the State of Connecticut to the science center in 1980. To the extent that the science center claims that its necessity for an easement was created when that parcel was created from the state's larger holdings, any right to an easement by necessity must be exercised across the land of its grantee, not across the land of others, absent evidence of any expectation or intention to create multiple access routes at the time of severence, when no more use was made of the ridge than of other paths. Hollywyle Association, Inc. v. Hollister, supra,164 Conn. 398.
Easement by Implication
The science center and its lessees assert that the court should recognize an easement by implication from the state parcel across the Abington land via Gibraltar Road to Montevideo Road, arising from the Hoe-Whitehead conveyance. This court has found that the conveyance from Hoe to Whitehead did not include an easement to cross Whitehead's land at locations other than on the path of the road in order to reach Gibraltar. This court has also found that no such easement is implied by necessity from the Hoe-Whitehead conveyance. The state parcel, which is a portion of the retained Hoe property, cannot be implied to have rights different from the retained property as a whole, in the absence of any evidence to support the existence of such right.
The Restatement of the Law of Real Property (Third) Servitudes, which has been cited with approval by the Supreme Court in Abington I, states at § 2.11, regarding servitudes created by implication, that "(a) The creation of a servitude burden may be implied by the circumstances surrounding the conveyance of another interest in land." The science center characterizes the Hoe-Whitehead conveyance as the relevant conveyance. Since this court has not found any basis for implying a servitude in favor of the retained Hoe parcel to cross the CT Page 5514 conveyed land to reach particular parts of that parcel other than the tower, no different implication can be made in favor of a smaller portion of the same parcel. Section 2.11 of the Restatement, like other provisions concerning servitudes, looks to the intentions and expectations of the parties at the time the need for access arose, not to the later expectations and desires of persons who take their interests from later grantors.
A landowner with one means of access who favors a more convenient means has the option of purchasing an easement to the desired route. The science center has not shown that at the time the access road was conveyed from Hoe as the common grantor there was any intention to create vehicular access by leaving the road and travelling across part of Whitehead's property to the area of the state parcel. No evidence has been presented to support the implication that a separate route of access by carriage was intended at the time of the Hoe-Whitehead deed to the present state parcel.
Conclusion
This court finds that the 1890 deed did not create an express access easement from Montevideo Road across the Whitehead property to the retained property of Hoe including the ridge known as Gibraltar that includes the portion of the science center property known as the state parcel. The court finds no easement by necessity or implication arising from the 1890 conveyance.
The court finds that the federal access easements were not restricted to use appurtenant to the six-acre parcel referred to as the federal parcel, but that these easements were independently conveyed to the science center and that use of these easements to reach the science center's facilities on the state parcel does not constitute a misuse or burdening of the easements. Accordingly, the plaintiff has not proved its claim of trespass, and it has not proven entitlement to injunctive relief. Judgment shall enter in favor of the defendants on all counts of the complaint. The defendants shall recover their statutory court costs.
Beverly J. Hodgson Judge of the Superior Court CT Page 5515