[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On February 18, 1999, the plaintiffs, John T. and Jacqueline P. Martin, appealed the failure of the defendant, Planning and Zoning Commission of the Town of Litchfield, to approve their application as amended in September of 1998 for a change of nonconforming use of property located at 82 Meadow Street in Litchfield. The plaintiffs acquired title to that property by warranty deed from Bradford Rowe on August 31, 1998 (Paragraph 2 of Appeal complaint of Feb. 18, 1999).
When the Town of Litchfield enacted zoning regulations in 1970, the subject property was owned by Mr. and Mrs. Frank Torrant. The first floor was used to conduct a funeral home (to include an office, funeral parlors, and other room dedicated to the conduct of the business) and the Torrants lived on the second floor (T-7, McCormick[1] and Appeal paragraph 2). In 1986, CT Page 13380 Bradford Rowe purchased the property from the Torrants and he continued to conduct a funeral business on the first floor while leasing out the second floor for residential proposes. Mr. Rowe relocated his funeral business to another Litchfield location in 1996 but continued to lease out the second floor apartment (Appeal paragraph 2). From 1994-1998, Mr. Rowe listed the property for sale as a non-conforming property (T-7, McCormick and Appeal paragraph 5). In 1994, a prospective buyer of the property, Dr. Martin T. Nweeia, applied for a change of use from a first floor funeral home to a first floor professional office with the second floor to continue as a residence (R-24-36). Though the Commission approved the application (R-33, 34, 35), the sale to Nweeia was not consummated and the property continued to be used — until 1996 — as a first floor funeral home and second floor residence. Rowe continued to market the property (Appeal paragraph 7).
In August of 1998, the plaintiffs became interested in purchasing the property and, by letter of August 7, 1998, the plaintiff, Jacqueline P. Martin, a local chiropractic physician, requested of the Commission verification that, if she bought the property, she could use the first floor for her chiropractic practice and continue residential use of the second floor (R-1, Appeal paragraph 8). By letter dated August 20, 1998, the Commission unanimously approved Dr. Martin's request for a "change of use to use the first floor as a professional office. . . ." (R-4). The plaintiffs closed on the property and, having analyzed her need for space with regard to the conduct of her practice and having completed a preliminary layout of the first floor, Dr. Martin concluded she had more space than her practice required. By counsel's letter of September 10, 1999, Dr. Martin amended her prior application and sought the Commission's approval to lease 433 square feet of the first floor as additional office use (Appeal paragraph 10, R-5, T-7, McCormick). At a Commission meeting on September 21, 1998, the plaintiffs made known that, though they did not then have a particular tenant in mind, they wished to lease to someone who would not generate excessive activity or traffic. The Commission's expressed consensus then was that it was not opposed in principle to a second office use on the first floor provided it were a low volume office use and the tenant were reviewed by the Commission or its Land Use Administrator to confirm this second user would not produce a high volume of traffic to or on the site (R-7, R-3, Minutes 9/21/98. T-27, 28, McGowan). In November of 1998. Dr. Martin identified the Litchfield branch of the American Red Cross CT Page 13381 as the potential tenant and requested approval (R-8). Thereafter, she provided the Commission a letter detailing the proposed tenant's office hours, staffing, and activities (R-13). On December 7, 1998, having completed renovations — to include some requested by the Fire Marshall's office, Dr. Martin relocated her practice from 15 Meadow Street to the subject premises.
The Commission held a public hearing on the Amended Application on February 1, 1999. Neighbors objecting to approval spoke and letters from neighbors — some in favor of and more in opposition to approval — were provided. Following the public hearing, the Commission discussed and voted on the Motion to Approve. The motion failed to carry (R-37, p. 34) and the plaintiffs have appealed.
Connecticut General Statute § 8-8 (b) provides any person aggrieved by any board's decision may take an appeal to the superior court for the judicial district in which the municipality is located. While the defendant denies the plaintiffs' allegations of aggrievement and cites in its brief the law applicable to aggrievement, it does not therein — nor did it at oral argument — argue the issue or offer any basis upon which this court might conclude this prerequisite to jurisdiction was not satisfied. At a regular meeting of the Commission on September 21, 1998, the plaintiffs were advised the Commission was not opposed in principle to a second office use on the first floor so long as it were a low volume office use and provided the prospective tenant were reviewed to assure the members that tenant would not generate a high volume of traffic or visitors to the property. Additionally, the plaintiffs followed that meeting with a memorandum of such discussion (R-7), which memorandum invited response. The defendant did not respond. It never took issue with any of the facts asserted in the memorandum nor did it offer to clarify any of the plaintiffs' understandings or the testimony of Commission members. Not surprisingly, the effect of the Commission's representations at this September 21, 1998, public meeting and of its failure thereafter to take any issue with the plaintiffs' recapitulation of that hearing was to encourage the plaintiffs not only to solicit and identify an appropriate tenant but also to undertake renovations consistent with two office uses on the first floor and to incur expenses to comply with local building codes. Having relied to their detriment on the defendant's representation it was not opposed in principle to a second office use on the first CT Page 13382 floor provided other stated requirements were met, having identified such a tenant and having advised the defendant of the same, having sought the approval of this Amended Application only to be denied approval of such use by a tenant conducting the business of the Red Cross as detailed in the plaintiffs earlier letter to the Commission (R-13), the plaintiffs have met their burden of demonstrating aggrievement so as to establish this court's jurisdiction in this administrative appeal.
The parties are agreed the plaintiffs' application was for a change of non-conforming use. They are further agreed Article VI, Section 6, sub-section 5 applies. In pertinent part, it provides:
 In determining whether an activity represents a change in non-conforming use, consideration shall be given to these factors:
 a. The extent to which the new use reflects the nature and purpose of the original non-conforming use;
 b. Any difference in the character, nature and kind of use involved, and
 c. Any substantial difference in effect upon the neighborhood resulting from the differences in the activities conducted on the property.
 Where such a change of non-conforming use is proposed, the Commission may approve that change if it finds that the proposed nonconforming use will not have an adverse effect on the zone, the neighborhood and surrounding properties greater that (sic) the effect the current non-conforming use has. In reaching this determination the Commission shall consider but not be limited to the following factors: traffic (both type and volume), number of uses permitted, noise, lighting, parking, and external alterations to the building and lot.
The parties differ with regard to whether the "change of use" for the Commission's consideration was from that of a funeral home to the proposed chiropractic/office use (as the plaintiffs argue) or from a professional office — specifically, a dental practice as the defendant argued to this court — to a professional/office use on the first floor.[2] It is entirely relevant that the dental practice was never established on the CT Page 13383 subject property. While Dr. Nweeia's application was approved, he never purchased the property or conducted his practice there. The property continued to be used as a funeral home (with second floor apartment) and remained on the market for sale. When Rowe relocated in 1996, the property remained unoccupied until the plaintiffs moved in in December of 1998. There was no "use" by Nweeia. If the conduct of a dental practice were the standard against which the plaintiffs' Amended Application was considered, it was inappropriate because that use never eventuated and necessarily required the Commission to speculate with regard to the effect on the neighborhood had the sale to Nweeia been consummated and had he operated a dental office there.
Our Supreme Court considered a similar question in FairlawnsCemetery Assn., Inc. v. Zoning Commission, 138 Conn. 434 (1952). There, the plaintiff maintained his right to conduct a cemetery as a non-conforming use in the face of a zoning regulation which purported to prohibit cemeteries in that area. Land bought to establish a cemetery had been properly deeded to the plaintiff and plans had been laid out on paper for that use. The property had already been cleared. There had, however, been no sales of burial lots and no interments. The Court upheld the trial court's finding the plaintiff was not irrevocably committed by an accepted dedication of the property to cemetery use since the clearing of the property might well have been considered by the trial court to be of equivocal significance. It concluded the lower court was justified in finding the efforts of the plaintiff were not "sufficient to put the property into actual utilization as a cemetery so that it would naturally be recognized in the neighborhood as such." Id. at 445. It stated, "To come within the provisions of the zoning regulations relating to nonconforming use, the use must be actual. It is not enough that it be a contemplated use even though plans for that have been put on paper." Id. at 444. It cited approvingly to a Pennsylvania court interpreting the phrase "existing use." "[N]either the act, the ordinance nor the law generally requires the court to speculate as to the number of acts or business transactions necessary to constitute an existing use but, as understood in the ordinance, `existing use' should mean the utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose." Id., citing Appeal of Haller Baking Co.,295 Pa. 257, 261 (1928). The applicable regulation in the instant case states, "Where such a change of non-conforming use is proposed, the Commission may approve that change if it finds that the proposed non-conforming use will not have an adverse effect CT Page 13384 on the zone, the neighborhood and surrounding properties greater that (sic) the effect the current non-conforming use has." Further, Article VI, Section 6, sub-section 5c of the regulations requires the Commission to consider "any substantial difference in effect upon the neighborhood resulting from the differences in the activities conducted on the property (emphasis added)." Presumably, the Commission's response to this argument would be that it was not required to speculate with regard to the effect on the neighborhood had Nweeia's dental practice been established since his Application provided information from which the Commission could reasonably have concluded the nature, kind, and character of the proposed use and the resultant impact on the neighborhood. That response is, however, unsatisfactory not only because the use of the dental practice as a measuring standard violates the plain wording of the regulation but also because, vis-a-vis the proposed dental practice and the plaintiffs' Amended Application, the Record established the following:
 1. Dr. Martin's practice is conducted weekdays from 8:15 — 5:00 and she sees approximately sixteen patients per day. Of the fifteen parking spaces available, her office utilizes five spaces — herself and two staff members for the entirety of the day and two patients coming and going per hour (R-2).
 2. The Red Cross conducts it business from 9:00 a.m. to 1:00 p. m. Monday — Friday and employs one staff person (R-15). Presumably that person would utilize one parking space. The Red Cross vehicle would additionally utilize one of four garage spaces.[3]
 The Red Cross has no regular "foot traffic" and no regular deliveries. Blood drives and class instruction are conducted off-site. Four times a year, twelve to fifteen attendees would participate in a board meeting. Approximately ten free blood pressure screenings per year would be conducted by a volunteer with an average of fifteen persons attending each screening.
 3. Dr. Nweeia's dental practice would have been conducted during the hours 8:00 a.m. to 6:00 p. m. and he anticipated treating a total of sixteen patients per day — two per hour.[4]
(R-28) He would have required the use of six parking spaces — four for staff daylong and two patients coming and going per hour.(R-26)[5]
CT Page 13385 Thus, the Record does not establish the plaintiffs' use of the first floor as a chiropractic/office practice would result in a measurably higher volume of pedestrian traffic during the daytime than would have existed had Dr. Nweeia in fact conducted his dental practice on the first floor nor would the Red Cross' occasional use of the first floor during evening hours lead to a different conclusion. A mere increase in the amount of business done pursuant to a non-conforming use is not an illegal expansion of the original use. Helicopter Associates, Inc. v. Stamford,201 Conn. 700, 716 (1986). There must be a change in the character of the existing use in order to bring it within the prohibition of the zoning ordinance. Salerni v. Scheuy, 140 Conn. 566, 571
(1954). Since the dental practice had never been an "existing use," the defendant's argument the use here was a change from "professional" to "professional/office" and is therefore an "extension" of the non-conforming use also misses the mark. It is so that when the Amended Application was acted upon by the Commission on February 1, 1999, Dr. Martin had already established her chiropractic office at 82 Meadow Street. Much is made by the defendant that the plaintiffs' Amended Application requested approval to use the first floor as a "professional office" and the second floor as residential (R-1) and that the Commission, on August 17, 1998, granted approval of that use because "within the guidelines of the previous approval." (R-3, Minutes-p. 1) Entirely relevant to this court's determination is that, despite Nweeia's intent to use the space for a "professional" office, that is not what was approved by the Commission. Though Nweeia had, in response to some input from the Commission, amended his prior Application on July 28, 1994, to request approval he use the first floor for a "professional" purpose, the Commission was less exacting in its use of language. On August 12, 1994, the town's Land Use Administrator caused to be published in the local newspaper a notice of public hearing regarding the Application. In pertinent part, it read, "The purpose of this public hearing is to consider a site plan application for change of non-conforming use from funeral home tooffice/residential (emphasis added). . . ." (R-30) Though the minutes of the July 18, 1994, Commission meeting indicated the Application was "for change of use (professional office)," the minutes of the 8/15/94 public hearing, at which hearing the Application was approved, read, "Site plan application for change of use from funeral home to office/residential. . ." (R-30) Following the public hearing, the Land Use Administrator, on August 23, 1994, advised Nweeia in writing (He had not personally attended the hearing but had sent his father as his CT Page 13386 representative.) the following, "At the August 15, 1994, meeting of the Litchfield Planning and Zoning Commission, the Commission approved your Site Plan application for a non-conforming change of use from funeral home to first floor office, second floor residential for property located at 82 Meadow Street (emphasis
added)." (R-35) It is clear that, regardless what the Commission may have intended to do, it did not restrict use of the first floor to "professional" utilization and thus the approval granted Nweeia was broader than the approval extended to these plaintiffs. It is also clear the defendant here attempts to hold these plaintiffs, who are laypersons without knowledge of the legal implications of terms of art in the lexicon of zoning law, hostage to their use of the word "professional" to describe their intended use of the first floor when the defendant, who is charged with knowledge of the legal consequences of zoning terms it employs, approves use of the first floor space as "office" and then later argues the approval was restricted to "professional" use. If, as one in the position of these plaintiffs have the right to conclude, the "previous approval" was for that of "office" space, the defendant is estopped from claiming the Commission approved Nweeia's use of the space as "professional" or from claiming what the plaintiffs here propose is a different use of the space than had been approved for Nweeia on August 15, 1994.
The only prior use of this property against which the instant application is appropriately measured is that use as a funeral home.[6] To conclude otherwise is to render nugatory the language of Article VI, Section 6, sub-section 5 of the regulations. The Commission need not have speculated with regard to the effect of the funeral business on the neighborhood since it had done business there for almost fifty years and it therefore had the information to determine whether the proposed use of the first floor as chiropractic/Red Cross would have a substantial difference in effect — that is, more adverse impact — on the neighborhood. A funeral home is a commercial use even if the owner of that business resides on the premises.[7] The Record established it was a use which generated a significantly higher volume of traffic — both vehicular and pedestrian during both daytime and evening hours — than those activities described in the Amended Application would generate under any circumstances. Families, friends, and guests came on site to make funeral arrangements, attend wakes and services, discuss pre-need and pre-funding planning, and engage in post-funeral and aftercare activities. CT Page 13387 Numerous employees came and went seven days a week, twenty-four hours a day. Youth groups were provided educational tours and hospice volunteers attended training sessions on site. Medical examiners came to determine cause of death. State inspectors visited to ensure regulatory compliance. Special trash removal services were required as were bio-medical waste disposal services. Diverse and frequent delivery vehicles — some necessarily quite large (i.e., floral and casket delivery trucks and monument deliveries by semi-tractor trailers) — and supply delivery trucks in addition to UPS, FedEx, etc. came, and sales representatives routinely visited. On the occasion of a wake or service, mourners came in cars sometimes numbering in the hundreds.(R-17) Significantly, the business by necessity included one or more offices where records were kept, arrangements were made, etc. Thus, these plaintiffs' request to use a portion of the space for "office" use was not a request for new use.[8]
Our Supreme Court has previously upheld a superior court's sustaining of an appeal on just this issue. In DiBlasi v. ZoningBoard of Appeals, 224 Conn. 823 (1993), the Court held the property owner (who conducted a construction business there and rented a portion of the property to a plumbing and heating supply company) should have been permitted to lease the property to the state for a proposed Adult Probation Office since "office use" existed on the site when in 1970 Litchheld enacted zoning regulations (CLP then owned the property and used the site for equipment maintenance and repair, storage, and an administrative office.). Given the funeral home's dedication of first floor space for office use, DiBlasi dictates a finding the requested use of the space for "office" purposes here is a continuation of a preexisting non-conforming use. A lawfully established non-conforming use is a vested right entitled to constitutional protection. Petruzzi v. Zoning Board of Appeals of Town ofOxford, 176 Conn. 479 (1979). Non-conformity is a vested right which adheres to the property. Carbone v. Viahotti, 222 Conn. 216
(1992). That this right may be passed on to others "in no way contradicts the recognized goal of eliminating non-conformities as quickly as possible since that policy must be carried out within the limits of permissible governmental action." Petruzzi, at 483.
Even were the Commission to conclude the proposed use of the first floor constituted a change of use (because it had, in August of 1998, approved Dr. Martin's use of the first floor for professional use), the Commission's dictate was to determine whether the use proposed in Dr. Martin's Amended Application was CT Page 13388 permissible under the regulations. In determining whether that change would have an adverse effect on the zone, the neighborhood, and the surrounding property, the regulations provide the Commission "shall"[9] consider such factors as traffic (type and volume), number of uses permitted noise, lighting, parking, and external alterations to the building and lot. With reference to the funeral parlor, the proposed use would produce significantly less traffic to and on the site with far fewer commercial vehicles, produce virtually no noise as compared to the noise of heavy trucks and the unloading of weighty monuments and caskets, require no change in external lighting with less use of the same due to the hours of business, no change in the amount of on-site parking with dramatically less — if any — use of the street itself for parking, and no external alterations to the building or lot. This use would have much less adverse effect on the immediate community than did the previously established non-conforming use. No other conclusion could be reached on the basis of the Record before this Commission.
The defendant stated no reason for its decision to reject the Application. Where no reason is stated, the court must search the record for a basis upon which to uphold the Commission's decision. Protect Hamden/New Haven from Excessive TrafficPollution, Inc. v. Planning Zoning Commission, 220 Conn. 527,544-45 (1991). The Record, however, contains the comments of two Commission members prior to the vote and the written and oral testimony of neighbors which the Court has reviewed in an effort to find a basis upon which to uphold the Commission's decision. With regard to the Commission members, the Minutes of 2/1/99 read:
 Carol Bramley was concerned about the Red Cross Board Meetings and the blood pressure screenings that would be part of the American Red Cross office use, and felt that this would have more impact on the neighborhood. Linda Bongiolatti stated that the Red Cross would constitute a third use for the property in addition to the chiropractic office and residence upstairs and felt that (sic) was more intensive than the previous funeral home use. Carol Bramley also stated that she felt the Board meetings at night presented a change in character from the present use which could have an adverse affect (sic) on the neighborhood. (R-3, 2/1/99 — "Consider Martin")
With regard to Ms. Bongiolatti's concern, for reasons earlier CT Page 13389 stated, the Red Cross use of a portion of the property as a business office is a continuation of the use made by the original non-conforming use and one which is part of every professional, business, commercial, industrial, or charitable enterprise. The fact this office use is as a result of a second presence on the first floor is not per se violative of any of the town's zoning laws and ignores the Commission's own charter when considering a change of non-conforming use — which is to consider the difference in the character, nature and kind of uses, and the differences in effect on the neighborhood resulting from the differences in activities conducted on the property. In the instant case, the proposed use impacts less adversely on the neighborhood.[10] Chairperson Bramley's concerns that the Red Cross board meetings (12-15 persons four times per year) and the free blood pressure screenings (10 screenings per year which historically attract an average of 15 persons per screening) would have a greater impact on the neighbors and that the evening meetings of Red Cross board members "presented a change in character from the present use which could have an adverse affect (sic) on the neighborhood" are against the great weight of the evidence and totally unsupported by the Record. So too are the concerns of the neighbors who spoke at the public hearing or sent letters. The Record establishes their primary concerns were that to permit the Red Cross' presence would: a) exacerbate traffic in this residential neighborhood and thereby threaten the physical safety of children residing on the street and lower property values, and/or b) constitute an expansion and increase in intensity of the original non-conforming use.[11] A careful review of the Record demonstrates that many of the comments offered at the public hearing contained misleading and false information distributed to neighbors in a leaflet which urged them to write letters and attend the public hearing (See flyer entitled "Your Help Is Needed Now!" included in R-23.). Encouraged by that flyer to believe, for example, that it was the Commission's policy to eliminate non-conforming uses as soon as possible — "usually when properties change hands" — and that the hearing would be about "doubling" a nonconforming use, much of the testimony repeated those assertions and, save for the efforts of Commission member McGowan and, in at least two instances, of Chairperson Bramley, many of those declarations — unsupported either by the regulations or by evidence proffered — went unchallenged and uncorrected. No evidence of increased street traffic was offered; in fact, one neighbor testified to the high volume of traffic on Meadow Street when the funeral home existed and that neighbor described the fear she had CT Page 13390 as a child walking along the street for the specific reason of the high volume of traffic generated by that business. Although one speaker cited a national publication that essentially said property values decreased when businesses were introduced in a residential neighborhood, there was not only no evidence offered to establish the same in this town or in this zone but it was to ignore that the funeral home had been there for almost fifty years and was more antagonistic to maintaining residential property values because a more intense commercial use than were the proposed activities. The concern by some that to permit the presence of the Red Cross constituted an expansion of the original non-conforming use misstates the applicable law. Finally, there was expressed a concern that, once on site, nothing existed to prevent the Red Cross from expanding their activities impermissibly — i.e., by conducting blood drives or holding classes on site. The response is that the Commission could have conditioned its approval on the Red Cross conducting only those activities and with the same frequency as represented to the Commission (See R-15.).
Oakwood Development Corporation v. Zoning Board of Appeals,20 Conn. App. 458 (1990) is not disposative of this appeal because factually very different and because the Board there made specific findings to support its conclusion that the construction of multi-family housing in an industrial zone could tend to create or aggravate a traffic or fire hazard, could tend to block or hamper the town pattern of highway circulation, and could tend to depreciate the value of property in the neighborhood or be otherwise detrimental to the neighborhood or its residents or alter the neighborhood's essential characteristics. Id. at 459. The Commission was also aware the Industrial Development Commission and the Planning and Zoning Commission as well as the Mayor wished to preserve smaller industrial parcels in the hope of recruiting new industry. Id. at 459-60. Essentially, this multi-family dwelling was not in keeping with the city's plan for economic development and, given the specific findings of the Board, the Board's denial of the plaintiffs application for a special exception permit was not an unreasonable exercise of its authority supported as it was by the Record.
The Commission's denial of the Amended Application was unsupported by the Record and contrary to the great weight of the evidence before it. It acted arbitrarily and abused its discretion in denying this Amended Application, apparently focusing on unsupported fears, speculation, and factors not CT Page 13391 relevant to a determination whether the proposed use was a change in use. The motion to approve should therefore have carried. The appeal is sustained and, pursuant to Conn. Gen. Stat. § 8-8
(l), the Commission is ordered to approve the application as amended.
BY THE COURT
SHEEDY, J.