# CIRCUIT COURT OF THE CITY OF NORFOLK

Fong Yuen Gray

v.

Zoning Appeals Board
of the City of Norfolk

July 30, 2004

Case No. (Law) L04-135

BY JUDGE CHARLES E. POSTON

Today, the Court affirms the Board of Zoning Appeals' ruling from which Petitioner Fong Yuen Gray appeals.

*Facts*

On December 1, 1994, George H. Croft, Jr., purchased Lots 12, 13, and 14, Block 5, Plat of Chesapeake Place, in the West Ocean View section of Norfolk. When Croft purchased those lots, an eight-unit apartment complex existed, and still exists, on them. The apartment complex had been a lawfully established structure on the lots before amendments to the Norfolk Zoning Ordinance in 1992; however, they failed to satisfy the 1992 zoning amendments for zoning district R-12, which required a 100-foot minimum lot width per structure and a minimum lot area of 2,200 square feet per unit for multiple-family dwellings of seven or more units. Norfolk, Va., Zoning Ordinance § 4-12 (2004). Lots 12, 13, and 14 measured a total of 75 feet wide and 150 feet long (11,250 square feet, 1,406.25 square feet per unit). Thus, after the passage of the 1992 zoning amendments, the lots became a lawfully established nonconforming lot.

On December 18, 1996, Croft purchased vacant Lots 10 and 11 adjacent to Lots 12, 13, and 14. Lots 10 and 11 measure a total of 50 feet wide and 150 feet long, thus making them suitable for building either a single family home or duplex in compliance with the R-12 zoning district requirements. If all of Croft's lots were viewed as a whole, however, the apartment complex was on a conforming lot because it met the minimum frontage requirements in the R-12 zoning district.

On April 23, 2002, Croft conveyed Lots 12, 13, and 14 to Landmark Property Service, L.L.C., and, on July 15, 2002, he conveyed Lots 10 and 11 to Petitioner Fong Yuen Gray for $42,000. The Petitioner subsequently listed Lots 10 and 11 for resale with Long and Foster Realty Company, neither of which have ever been developed, as zoned for single-family or duplex use. The Petitioner entered into a contract to sell Lots 10 and 11 for $151,500. Lots 10 and 11 have never been developed by any party. At all times, Lots 10 and 11 and Lots 12, 13, and 14 have been separately assessed for real estate tax purposes.

On or about August 7, 2003, and prior to closing on the resale contract for Lots 10 and 11, the Petitioner received a letter from Leslie Lynn Garrett, a Norfolk Zoning Enforcement Coordinator, advising that Croft illegally conveyed Lots 10 and 11. The letter further stated that Lots 10 and 11 "do not constitute a legal buildable site" and "if these lots are sold, the seller will be at risk of legal repercussions from the buyers." On November 12, 2003, David S. Hay, Esquire, attorney for the Petitioner, received a letter from Leonard M. Newcomb, III, the Norfolk Zoning Administrator, advising that Croft "illegally" conveyed Lots 10 and 11 to the Petitioner. Newcomb relied upon the definition of "lot" in section 2-3 of the Ordinance, which prohibits a division or combination that causes a residual lot to be out of compliance with the Ordinance requirements.

On December 3, 2003, the Petitioner appealed the Zoning Administrator's determination to the Board of Zoning Appeals of the City of Norfolk (BZA). During the BZA's hearing of the appeal on January 15, 2004, Garrett testified to having received information that tenants of the apartment complex on Lots 12, 13, and 14 had allegedly used Lots 10 and 11 for "parking purposes and things of that nature." Two residents testified that the two lots had been used for overflow parking by tenants of the apartment complex on Lots 12, 13, and 14. One of the residents, who lived across the street from Lots 10 and 11, testified that, on many occasions, he witnessed people parking on Lots 10 and 11 and going directly into the apartment complex on Lots 12, 13, and 14. There was no evidence that Croft authorized this use, nor that he was even aware of his tenants' occasional parking on Lots 10 and 11.

Newcomb testified that his interpretation of "lot" has been applied consistently for many years in Norfolk in similar cases. He further explained that his interpretation "is the essence of the way zoning works in an older city where you have underlying patterns of lots that are in no case conforming to any of your zoning regulations."

Some BZA members expressed doubts as to how to rule on the Petitioner's application. One BZA member stated, "I feel that this is a very unfortunate incident in procuring property that you can't develop. .... I don't think this is the venue to be taking on such an issue as this. I don't feel that I'm capable of overturning the [Zoning Administrator's] decision." The Chairman of the BZA stated, "This may require someone else to decide this issue." Another BZA member asserted that the evidence had persuaded him that the Zoning Administrator made the correct determination. The BZA denied the Petitioner's appeal application by a six-to-zero vote, affirming the Zoning Administrator's determination. The Petitioner then filed for a writ of certiorari to the Court seeking to reverse the BZA's ruling.

*Discussion*

This is a case of first impression in the Commonwealth and the facts presented are troubling. One would have hoped that the City would have addressed this issue with Croft when he sold Lots 12, 13, and 14. Instead, the City intervened after the Petitioner bought Lots 10 and 11; thus the Court's decision will affect those who sold or purchased the lots in good faith. Neither the Norfolk City Ordinance nor the Virginia Code effectively addresses this situation.

All parties agree that Lots 12, 13, and 14 were a lawfully established nonconformity. In the Commonwealth of Virginia, a landowner has a constitutional right to continue a lawfully established nonconformity. *Carolinas Cement Co. v. Zoning Appeals Bd.*, 49 Va. Cir. 463, 475 (1999). A lawfully established nonconformity will be protected so long as it is not abandoned, discontinued for more than two years, or expanded. *See Knowlton v. Browning-Ferris Indus. of Va., Inc.*, 220 Va. 571, 576 (1979). However, public policy favors the eventual elimination of nonconformities to reach compliance with a comprehensive plan. *City of Chesapeake v. Gardner Enters.*, 253 Va. 243, 248 (1997). The Norfolk City Ordinance discusses nonconformities generally in Chapter 12:

> It is the intent of this chapter to permit such nonconformities to continue until they are removed but not to encourage their continuation over time. ... In any case where the property owner or

possessor shall assert the presence of a vested right or legal nonconformity, any doubt or uncertainty, as to fact or law, shall be resolved against the continuation of the nonconformity and in favor of actual compliance with these regulations.

Norfolk, Va., Zoning Ordinance § 12-1 (1999). The dual purpose articulated by the Ordinance creates a challenging conflict. *See e.g., Montgomery v. Board of Zoning Appeals of Norfolk*, 45 Va. Cir. 126 (1998).

The Ordinance defines "lot" in relevant part as:

[A] piece of land identified on a plat of record or in a deed of record and of sufficient area and dimensions to meet district requirements for width, area, use, and coverage, and to provide such yards and open space as are required. ... A lot may consist of combinations of adjacent individual lots and/or portions of lots so recorded; *provided, however, that in no case of division or combination shall any residual lot, portion of lot, or parcel be created which does not meet the requirements of this ordinance and the subdivision regulations of the city.*

Norfolk, Va., Zoning Ordinance § 2-3 (2002) (emphasis added). The Zoning Administrator extrapolated his determination from the emphasized portion of the Ordinance and reasoned that since the Ordinance's "mission statement" empowers him to resolve all cases allowing for the exercise of his discretion against perpetuating the nonconformity, the definition of "lot" encompassed subsequently purchased lots. Thus, he determined that because Lots 10 and 11 merged with Lots 12, 13, and 14, they could not be divided without violating the Ordinance. The Zoning Administrator testified that this was his consistent interpretation of the Ordinance, and the BZA relied upon the rule that the consistent interpretation of an ordinance by those who enforce it deserves great weight. *E.g., Commonwealth v. American Radiator & Standard Sanitary Corp.*, 202 Va. 13, 19 (1960).

The standard of review for a petition for writ of certiorari appealing a decision of the BZA is established by the Virginia Code, which states:

In the case of an appeal from the board of zoning appeals to the circuit court of an order, requirement, decision, or determination of a zoning administrator or other administrative officer in the administration or enforcement of any ordinance or provision of state law, the decision of the board of zoning appeals shall be presumed to be correct. The appealing party may rebut that presumption by proving by a preponderance of the evidence, including the record

before the board of zoning appeals, that the board of zoning appeals erred in its decision. Any party may introduce evidence in the proceedings in the court.

Va. Code Ann. § 15.2-2314 (2004). The presumption of correctness that attached to the BZA's ruling is a presumption that the BZA acted reasonably. *Board of Supervisors v. Robertson*, 266 Va. 525, 532 (2003) (citing *Board of Supervisors v. McDonald's Corp.*, 261 Va. 583, 590 (2001)). "[The BZA's] action is reasonable if the matter in issue is fairly debatable." *Board of Supervisors v. Lerner*, 221 Va. 30, 34 (1980). "An issue is >fairly debatable when the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions'." *Robertson*, 266 Va. at 532 (quoting *Board of Supervisors v. Williams*, 216 Va. 49, 58 (1975)). "Where presumptive reasonableness is challenged by probative evidence of unreasonableness, the challenge must be met by some evidence of reasonableness. If evidence of reasonableness is sufficient to make the question fairly debatable, the [BZA's ruling] >must be sustained.' If not … the [BZA's ruling] cannot be sustained." *Id.* at 533 (citing *Board of Supervisors v. Snell Constr. Corp.*, 214 Va. 655, 659 (1974)).

## Petitioner's Contentions

The Petitioner challenges the BZA's determination on three grounds: (1) The Zoning Administrator based his determination on an incorrect interpretation of the Ordinance's definition of "lot" ; (2) the Petitioner had no notice that purchasing Lots 10 and 11 was "illegal" ; and (3) the Zoning Administrator's determination violated Croft's vested right in continuing a nonconforming lot.

### A. Interpretation of the Term "Lot"

The Petitioner argues that the Zoning Administrator incorrectly applied the Ordinance's definition of "lot" to the merging of adjoining conforming and nonconforming lots with a common owner. Specifically, the Petitioner argues that the Zoning Administrator's interpretation violated state law because no provisions in the Virginia Code allow a municipality to merge lots without a valid, approved, and recorded subdivision plat. While no Virginia authority exists on the issue of merging conforming and nonconforming lots, Connecticut has addressed the issue of merger. *Molic v. Zoning Bd. of Appeals of Redding*, 18 Conn. App. 159, 556 A.2d 1049 (1992), and *Carbone v. Vigliotti*, 222 Conn. 216, 610 A.2d 565 (1992), stand for the rule that contiguous parcels of land may be merged if the owner desires to do so, but

the parcels do not merge by operation of law unless required by specific zoning regulations. While *Molic* and *Carbone* do not resolve the present matter, they demonstrate how at least one other state has dealt with this question.

When *Molic* and *Carbone* are applied to the Petitioner's case, they support the Petitioner's argument that Croft never intended for Lots 10 and 11 to be used in conjunction with Lots 12, 13, and 14 and that the lots should not be merged by law. As the Petitioner points out, the lots have always been taxed separately and presently remain separate uses. However, there is some vague evidence in the testimony from the BZA hearing that Croft may have allowed Lots 10 and 11 to be used as a parking lot for tenants of the apartment complex on Lots 12, 13, and 14. Further, the Zoning Administrator is entitled to deference for his experience and consistent interpretation of the Ordinance. There is no authority in Virginia to guide the Court on this question, and, at best, the Connecticut merger rule makes the issue fairly debatable. Because this Court must uphold any fairly debatable decision made by the BZA, the Court affirms the BZA's ruling with regard to the Zoning Administrator's interpretation of the word "lot" and its application to Lots 10 and 11 and Lots 12, 13, and 14. Such an interpretation is indeed reasonable.

## B. *Notice*

Next, the Petitioner argues lack of notice when purchasing Lots 10 and 11 that Croft's ownership of Lots 10 and 11 and Lots 12, 13, and 14 had merged the properties into one lot for purposes of the Zoning Ordinance, thus rendering the Petitioner's purchase "illegal." There is no limitation on the timing or means used by a zoning administrator in determining that a zoning ordinance violation exists. *Gwinn v. Alward*, 235 Va. 616, 622 (1988) (analyzing Va. Code Ann. §§ 15.1-491(d) (superseded by § 15.2-2286), 15.1-499 (superseded by § 15.2-2208)). Also, the equitable remedies do not apply against the government in the discharge of governmental functions. *Dick Kelly Enters. v. City of Norfolk*, 243 Va. 373, 378 (1992). Thus, a zoning administrator cannot be estopped from enforcing the zoning ordinance because of invalid means or the passage of time since the violation occurred. "As long as the zoning administrator >makes clear the basis upon which relief is sought' when rendering a decision, and when the proof at trial is sufficient, the government is entitled to relief." *Id.* at 378-79 (citing *Alward*, 235 Va. at 622).

In *Alward*, the zoning administrator advised the respondent that the property in question violated the zoning ordinance because the site was used for refuse collection and for storing related vehicles. The Board of Supervisors tried to enforce the violation by seeking an injunction in a cross-bill on a

permit application appeal. The respondent had obtained a trash-collection permit for the previous thirty-four years from the county government. In addition, the relevant zoning ordinance took effect six years before the zoning administrator determined that the respondent's property violated the zoning ordinance. The court held that the zoning administrator and Board were entitled to relief against the respondent even though considerable time had passed since the violation's occurrence.

In the case *sub judice*, despite all of the efforts by the Petitioner to perform an exhaustive title search and discover any burdens upon Lots 10 and 11, the Zoning Administrator maintained the power to enforce the Ordinance against any violations inherent in Lots 10 and 11 after the Petitioner's purchase. This conclusion does not seem fair to the Petitioner, who made a good faith effort to ensure that Lots 10 and 11 were unencumbered. Concluding otherwise, however, would inhibit the Zoning Administrator's ability to enforce the Ordinance by limiting his enforcement authority to only those violations that a title search could discover or that the property owner discovered or should have discovered before purchasing the property. The Zoning Administrator's authority to enforce the Ordinance directly affects the city's ability to plan effectively. The *Alward* rule also negates any challenge of the BZA and the Zoning Administrator for not noticing this violation before Croft sold Lots 10 and 11 to the Petitioner since only a few months had passed since Croft had sold Lots 12, 13, and 14, much less than the six years allowed in *Alward*. It is indeed most unfortunate that the Petitioner had no notice that Lots 10 and 11 had merged with Lots 12, 13, and 14, but the Zoning Administrator's ability to enforce the Ordinance must be uninhibited.

## C. *Vested Rights*

Finally, the Petitioner argues that Croft had a vested right based in § 15.2-2307 of the Virginia Code in continuing the nonconforming lot on which the apartment complex stood. The Code states, in relevant part:

> Nothing in this article shall be construed to authorize the impairment of any vested right. . . .
>
> [Except that a] zoning ordinance may provide that land, buildings, and structures and the uses thereof which do not conform to the zoning prescribed for the district in which they are situated may be continued only so long as the then existing or a more restricted use continues and such use is not discontinued for more than two years, and so long as the buildings or structures are maintained in their then structural condition; and that the uses of

such buildings or structures shall conform to such regulations whenever they are enlarged, extended, reconstructed, or structurally altered. . . .

Va. Code Ann. § 15.2-2307 (2004). The Petitioner contends that a strict statutory analysis indicates that the majority of § 15.2-2307 of the Code is concerned with only nonconforming uses while the first sentence of § 15.2-2307 solely applies to *all* nonconformities. Va. Code Ann. § 15.2-2307 (2004). Thus, she says, the first sentence protects property owners' vested rights in all types of nonconformities that lawfully existed prior to the enactment of the zoning ordinance. Because no limitations or exceptions are placed upon this sentence's application to nonconforming lots, the Petitioner contends that the logical interpretation of this Code section is that vested rights in nonconforming lots may not be impaired by any means; therefore, one who owns a nonconforming lot may continue that nonconformity indefinitely and the zoning authority may not do anything to impair that vested right.

The BZA responds that the Petitioner's vested rights were terminated by the merging of Lots 10 and 11 and Lots 12, 13, and 14 into one conforming lot. Thus, the Petitioner's vested rights were not infringed by the Zoning Administrator's determination, but rather the vested rights simply terminated with the elimination of the nonconformity. The BZA further argues that Croft could not then divide the one conforming lot such that a residual nonconforming lot remained, even if that nonconforming lot had previously lawfully existed, because the vested rights to continue that nonconforming lot had terminated.

Again, the Court cannot overrule the BZA's determination unless probative evidence of unreasonableness is presented. The Petitioner tries to meet this burden by arguing that the Zoning Administrator's interpretation of the Norfolk City Ordinance violates Virginia Code § 15.2-2307. The BZA's ruling is not patently in conflict with the Virginia Code because the Code does not clearly distinguish between the different types of nonconformities; otherwise the Petitioner's argument might be persuasive. At least one other jurisdiction has made a key distinction between a nonconforming use and a nonconforming lot. A Pennsylvania statute describes a nonconforming lot as being "a lot the area or dimension of which was lawful prior to the adoption or amendment of a zoning ordinance, but which fails to conform to the requirements of the zoning district in which it is located by reasons of such adoption or amendment." 53 Pa. Cons. Stat. § 10107 (2004). A nonconforming use, on the other hand, is a use of land or structures thereupon which does not comply with the applicable provisions of the zoning ordinance

where such use lawfully existed before the enactment of the zoning ordinance. *Id.* One treatise explains:

> The term "nonconforming uses" is often used without consideration as to what aspect of the use of property is nonconforming, and in determining whether an activity is an expansion or change of a nonconforming use, the nature of the nonconformity is important. There are basically four types of nonconformity: (1) nonconforming use — the use of the land or structure on it is nonconforming (e.g., commercial use in a residential zone); (2) a nonconforming lot — the lot is undersized, irregularly shaped, has inadequate width or depth or inadequate frontage; (3) nonconforming building or structure — the structure does not meet the minimum or maximum size requirements, floor area ratio, height or bulk requirements of the existing zoning regulations; (4) nonconformity as to location of structure, i.e., it does not conform with one or more of the setback requirements. These distinctions are important because a particular piece of property may be nonconforming in one of these respects, but conforming as to the others. The prohibition of expansion of nonconforming uses applies only to the aspect of the use or structure which is nonconforming.

R. Fuller, *Land Use Law and Practice*, § 52.1 (2d ed. 1999). A clearly articulated distinction between the different types of nonconformities has not been made by the Virginia Code or Virginia case law. Thus, the Court concludes that the different terms for nonconformities are effectively interchangeable, and that Va. Code § 15.2-2307, as a whole, applies to all nonconformities.

The Petitioner further contends that a vested right in a nonconformity may continue indefinitely under her understanding of Va. Code § 15.2-2307 so long as the nonconformity falls within the purview of the first sentence. However, the statutory intent in recognizing lawfully established nonconformities is that they would eventually be eliminated. *See City of Chesapeake v. Gardner Enters.*, 253 Va. 243, 248 (1997). Thus, the Petitioner's understanding would result in nonconformities that are contrary to public policy and that may exist in perpetuity. The Court can envision many cases, especially in a city as old as Norfolk, where lots, not initially in common ownership but subsequently merged and established as such for several decades, are now sought to be divided again. In fact, since zoning is a relatively modern concept in American law, all lots existing prior to such practices would possess vested rights in sizing nonconformities regardless of their incarnations over the years. The Court concludes that in cases such as

this, the date when adjacent lots fall under common ownership marks the termination of the vested right in maintaining a nonconforming lot. Otherwise, the very purpose of zoning would be undermined.

## Conclusion

The circumstances of the Petitioner's case call to mind the tension between the government's police powers, the need for comprehensive planning, and the individual's rights in owning private property. Clearly, the nonconforming lot composed of Lots 12, 13, and 14 should be eliminated lawfully in accordance with public policy. Yet, it seems manifestly unjust to deprive the Petitioner of the profits she might have realized by reselling Lots 10 and 11. The Petitioner merely failed to discover the illegality of Croft's sale of Lots 10 and 11 independent of adjoining Lots 12, 13, and 14, a condition which could only have been discovered in consultation with the zoning authority and not through normal title search procedures. Nonetheless, the Court cannot depart from the appropriate standard of review for this matter on appeal nor can the Court authorize a situation where a nonconformity might continue indefinitely in violation of public policy. With great reluctance, the Court affirms the BZA's ruling.